EXHIBIT TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

CIVIL ACTION NO. **4:17-cv-01332**

# **EXHIBIT C**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   MALIKA RILEY                  )
               Plaintiff,          )
 4                                 )
     V.                            )  Civil Action No.
 5                                 )  4:17-cv-01332
     CHEVRON PHILLIPS CHEMICAL     )
 6   CORPORATION, LP               )
               Defendant.          )  JURY DEMANDED
 7

 8   **************************************************
                ORAL/VIDEOTAPED DEPOSITION OF
 9
                      MALIKA RILEY
10
                    JANUARY 24, 2019
11   **************************************************

12         ORAL/VIDEOTAPED DEPOSITION OF MALIKA RILEY,

13   produced as a witness at the instance of DEFENDANT, and

14   duly sworn, was taken in the above-styled and numbered

15   cause on Thursday, JANUARY 24, 2019, from 10:16 a.m. to

16   6:20 p.m., before Kathleen Rossi Tyler, CSR in and for

17   the State of Texas, recorded by machine shorthand, at

18   the offices of ROSENBERG & SPROVACH, 3518 Travis, Suite

19   200, Houston, Texas, pursuant to the Federal Rules of

20   Civil Procedure and the provisions stated on the record

21   or attached hereto; signature having been waived.

22

23

24

25                     JOB NO. 1-286079
```

**EXHIBIT C**

Malika Riley
January 24, 2019                                              2

```
1                    A P P E A R A N C E S

2

   FOR PLAINTIFF:
3       MS. ELLEN SPROVACH
        ROSENBERG & SPROVACH
4       3518 Travis, Suite 200
        Houston, Texas  77002
5       (713) 960-8300
        e-mail:  ellen@rosenberglaw.com
6

7  FOR DEFENDANT:
        MS. MARLENE C. WILLIAMS
8       EVERSHEDS SUTHERLAND, LLP
        1001 Fannin Street, Suite 3700
9       Houston, Texas  77002
        (713) 470-6100
10      e-mail:  marlenewilliams@eversheds-sutherland.com

11

   VIDEOGRAPHER:
12      Mr. Corey Laborde

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              E X A M I N A T I O N    I N D E X

 2

       WITNESS:  MALIKA RILEY
 3
       EXAMINATION                                 PAGE
 4
           BY MS. WILLIAMS                           5
 5         BY MS. SPROVACH                         259

 6     FURTHER EXAMINATION

 7         BY MS. WILLIAMS                         271
           BY MS. SPROVACH                         276
 8         BY MS. WILLIAMS                         278
           BY MS. SPROVACH                         280
 9         BY MS. WILLIAMS                         282

10     SIGNATURE WAIVED                            292
       REPORTER'S CERTIFICATION                    293
11

12              E X H I B I T    I N D E X

13     RILEY EXHIBIT NO. 1                         139
           Performance improvement plan
14
       RILEY EXHIBIT NO. 2                         154
15         Letter from Malika Riley to Melissa
           Simpson, July 6, 2016
16
       RILEY EXHIBIT NO. 3                         169
17         Plan documented items, Riley 000038-
           000042
18
       RILEY EXHIBIT NO. 4                         201
19         E-mail chain, November 14, 2016,
           Riley 000058
20
       RILEY EXHIBIT NO. 5                         208
21         E-mail chain, March 24, 2016, Riley
           000026-000027
22
       RILEY EXHIBIT NO. 6                         210
23         E-mail chain, Riley 000019-000021

24     RILEY EXHIBIT NO. 7                         211
           E-mail chain, November 15, 2016, Riley
25         000013
```

Malika Riley
January 24, 2019                                          4

1                  E X H I B I T   I N D E X (continued)

2    RILEY EXHIBIT NO. 8                              212
         E-mail, November 21, 2016, Riley 000014
3
     RILEY EXHIBIT NO. 9                              245
4        Education refund application

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Malika Riley
January 24, 2019                                    29

```
 1     A.    Yes.  Yes.  I did.

 2     Q.    Okay.  For approximately how long?

 3     A.    I believe it was two months I worked contract

 4  work, and I believe it was for Burnett Staffing at

 5  PeroxyChem, which is a plant in Pasadena.

 6     Q.    Okay.  And then you moved from that contract

 7  work to the position at Chevron Phillips Chemical?

 8     A.    Yes, ma'am.

 9     Q.    When did you start at Chevron Phillips

10  Chemical?

11     A.    January of 2015.

12     Q.    And you were there until November 2016; is that

13  correct?

14     A.    Yes, ma'am.

15     Q.    Okay.  I'm going to come back to Chevron

16  Phillips Chemical, but I want to move a little bit past

17  that.  After you were terminated from Chevron Phillips

18  Chemical, where did you work next?

19     A.    After Chevron Phillips, I worked for a few

20  contract agencies, and then the employer was 24Hr

21  Safety in a full-time role.

22     Q.    What was the first contract agency you worked

23  for after Chevron Phillips Chemical?

24     A.    I'm mistaken.  I did not work during that

25  period.  After Chevron Phillips I applied to several
```

Malika Riley
January 24, 2019                                                40

1      Q.   And -- and just for clarification, what
2   position did you apply for at CP Chem?
3      A.   Human resources business partner.
4      Q.   And you said you had an interview?
5      A.   Yes, ma'am.
6      Q.   Okay.  How many interviews did you have?
7      A.   I believe it was three.
8      Q.   Were they all at one time, or were they -- did
9   you have to go in multiple times for interviews?
10     A.   I had to go in multiple times.
11     Q.   Okay.  Who did you interview with?
12     A.   There was a phone interview.  I don't recall
13  who was on that phone interview.  Then I received an
14  on-site interview with Julie Fleet, Kristin Cothren,
15  Rita Tolleson, and the technical manager.  I don't
16  recall his name.
17     Q.   Did you have an understanding when you applied
18  for the position that -- the HR business partner
19  position -- that it was for a particular group at Cedar
20  Bayou that you would be supporting in that role?
21     A.   Yes.
22     Q.   Which group?
23     A.   Operations.
24     Q.   And so the on-site interview included one
25  interview where Julie, Kristin, Rita, and the tech

Malika Riley
January 24, 2019                    41

```
1    manager all participated?

2        A.   Yes, ma'am.

3        Q.   And then you said there was a third interview?

4        A.   Yes, ma'am.

5        Q.   Tell me about that one.

6        A.   That was with Mar- -- Marcela.

7        Q.   Caballero?

8        A.   Caballero.

9        Q.   What's Marcela's position or what was it at the

10   time?

11       A.   I believe it was HR director.

12       Q.   What was Julie Fleet's position at the time?

13       A.   HR manager.

14       Q.   And Kristin Cothren's?

15       A.   HR business partner.

16       Q.   Rita Tolleson?

17       A.   HR assistant.

18       Q.   Okay.  And then the tech manager was the tech

19   manager?

20       A.   Yes, ma'am.

21       Q.   Okay.  And did the on site -- you had an

22   on-site interview with Marcela Caballero?

23       A.   I was asked to go to The Woodlands location of

24   the corporate office.

25       Q.   And was that just with Marcela?  Did anyone
```

Malika Riley
January 24, 2019                                                    42

1   else participate in that interview?

2       A.   I don't recall who else I met with, but I did

3   meet with Marcela that day.

4       Q.   Okay.   About how long did the interview process

5   take between the time you first had an interview or

6   applied and then the time that you actually received an

7   offer?

8       A.   It took about three weeks.

9       Q.   And did Julie extend the offer to you

10  personally?

11      A.   No.   Kristin Cothren sent me the offer.   I

12  believe Julie did call me to communicate my acceptance.

13      Q.   Between the time that you got the offer and the

14  time you accepted, about how much time passed during

15  that period?

16      A.   I received the offer.   Within a week of

17  receiving the offer I was given a start date and stated

18  that I would like to start in January.   I received the

19  offer at the end of December and already had some

20  things, travel arrangements in place.   So they agreed

21  to start me in January.

22      Q.   Okay.   And that's January 2015, correct?

23      A.   Yes, ma'am.

24      Q.   Did you note any -- so you -- you understood

25  when you applied for the position that you would be

1  reporting to Julie Fleet at -- who held the HR manager

2  role; is that right?

3      A.   Yes, ma'am.

4      Q.   Did you know anything about Julie Fleet when

5  you applied for the job?

6      A.   No, ma'am.

7      Q.   Did Roy Watson give you any insight about her

8  when you applied for the job?

9      A.   No, ma'am.

10     Q.   At any point during the interview process, did

11  -- did anybody talk to you about Julie Fleet?

12     A.   No, ma'am.

13     Q.   Did you ask anybody any questions about her?

14     A.   No, ma'am.

15     Q.   Okay.  What was your understanding of the

16  responsibilities of the role of HR business partner

17  when you applied for the job?

18     A.   I knew that there were several

19  responsibilities.  I knew it would be very similar to

20  other business partner and generalized roles that I

21  held.  I knew I would be supporting the operations

22  department.  I knew I would re- -- would be responsible

23  for employee relations, investigations, some comp and

24  benefits, typical HR generalist, business partner

25  responsibilities.

Malika Riley
January 24, 2019                                              44

1      Q.    Did you say typical --

2      A.    Yes, ma'am.

3      Q.    -- HR business partner generalist

4   responsibilities?

5      A.    Yes, ma'am.

6      Q.    Okay.  What specifically were your

7   responsibilities with respect to employee relations?

8   What did that entail at CP Chem?

9      A.    So with employee relations, I was responsible

10  for attending to the needs of my client group with

11  regard to any benefits, concerns that employees in my

12  client group needed assistance with, investigations

13  that needed to be conducted, recruiting efforts that

14  needed to be conducted, providing support/performance

15  management for my clients, policy

16  review/interpretation.  I led a number of product --

17  projects.

18     Q.    What type of projects did you lead?

19     A.    Implementation of policies related to hourly

20  hiring and changes and updates to current policies that

21  were in place throughout the location.

22     Q.    How many employees were in the operations group

23  at the time that you supported the group?

24     A.    Approximately 300, plus.

25     Q.    Did you consider that to be a large group of

1    employees to support in your HR role?

2        A.    No.

3        Q.    Okay.  Did you have a high volume of activity

4    supporting that group in these various functions that

5    you performed?

6        A.    Yes.

7        Q.    Was there one particular thing that would --

8    that dominated more with this group in terms of the --

9    the support you provided?

10       A.    The need for me to be out client-facing in the

11   plant, which is not out of the ordinary.  I was very

12   familiar with engaging with my clients, with employees

13   out in the field.

14       Q.    So you were used to doing that, but for this

15   particular group, that was sort of one of the things

16   that took up most of your time.  Is that a fair

17   characterization?

18       A.    Yes, ma'am.

19       Q.    And you would be out client-facing in the plant

20   for what type of -- of issues?

21       A.    Meetings.  When we rolled out new policies or

22   procedures related to time and attendance or policy

23   changes, updates, and during benefits time to engage

24   with employees and assist as needed with any concerns

25   or issues as well as during investigations or different

Malika Riley
January 24, 2019                                        46

1    training opportunities that I would either have to

2    participate in or lead.

3        Q.   Did you conduct investigations into employee

4    complaints for the operations group?

5        A.   Yes, ma'am.

6        Q.   Did you handle a lot of those in the time that

7    you supported the operations group?

8        A.   Yes, ma'am.

9        Q.   Can you -- can you tell me approximately how

10   many investigations you handled when you supported the

11   operations group?

12       A.   I would say between 15 and 20.

13       Q.   Did any of those investigations involve a

14   termination at the end of the investigation?

15       A.   I believe maybe one.

16       Q.   And the 15 to 20 investigations that you're

17   describing when you supported the operations group,

18   were you the lead investigator as the HR business

19   partner for the operations group in those

20   investigations?

21       A.   Yes, ma'am.

22       Q.   And the one that you said involved a

23   termination, that termination decision would have been

24   reached based on the information you collected in your

25   investigation; is that correct?

Malika Riley
January 24, 2019                                     47

1      A.    Correct.

2      Q.    And did you support that termination?

3      A.    Yes, ma'am.

4      Q.    Did you recommend that termination as a result

5   of your investigation?

6      A.    Yes, ma'am.

7      Q.    Do you recall what the reason or the issue was

8   in that particular investigation that resulted in a

9   termination?

10      A.    I don't recall the exact reason.

11      Q.    Was the employee terminated for cause?

12      A.    No, ma'am.

13      Q.    There was no cause associated with the

14   termination?

15      A.    Can you explain what you mean, "for cause"?

16      Q.    Do -- do you understand what that term means in

17   connection with your function as an HR business partner

18   when you terminate an employee for cause?

19      A.    There's a specific reason as to why an employee

20   is being terminated and also as it relates to our --

21   the random process with drug screens and -- and

22   medical-related items.

23      Q.    So just so I understand -- make sure that I'm

24   understanding you correctly -- it's your understanding

25   that "for cause" in the context of terminating someone

1    means that there's a specific reason for terminating

2    them --

3        A.    Yes.

4        Q.    -- is that right?

5        A.    Yes.

6        Q.    The reason might be related to -- I think you

7    said a random drug testing process; is that right?

8        A.    Yes, yes.

9        Q.    And you said it could be medical-related items

10   as well, or were you saying those are the same things?

11       A.    The same thing.

12       Q.    Okay.  So one of the specific reasons that

13   might constitute cause in terminating someone is the

14   results of a random drug testing process; is that

15   right?

16       A.    Correct.

17       Q.    What are some of the other reasons that you

18   understand, as an HR business partner and professional,

19   might constitute a specific reason or cause to

20   terminate an employee?

21       A.    There are several.  Threats, acts of violence,

22   job abandonment.  There are several reasons for -- that

23   would be for -- considered for cause for terminating an

24   employee.

25       Q.    Okay.  Can you think of any others based on

Malika Riley
January 24, 2019                                    49

1    your experience in HR what might constitute cause?

2         A.    Egregious acts.

3         Q.    Such as?

4         A.    A violation of -- a willful violation of

5    company policy or, again, threats or acts of violence

6    against other employees, if an employee failed a drug

7    test, if an employee doesn't show up from [sic] work,

8    if an employee fails to perform duties.

9         Q.    Any others you can think of?

10        A.    No, not off -- not at this time.

11        Q.    Okay.  And the one that you were involved in,

12   do you -- of the things that you just listed, did that

13   jog your memory as to what type of issue was involved

14   in the termination that you supported and recommended

15   when you supported the operations group at Cedar Bayou?

16        A.    Yes.

17        Q.    What was it?

18        A.    For that employee, he violated company policy

19   and was placed on leave and didn't abide by the terms

20   of the leave that he was placed on.

21        Q.    What policy did he violate?

22        A.    I don't recall at this time.

23        Q.    And you said that the employee was placed on

24   leave and did not abide by the terms of his leave.  How

25   did he not abide by the terms of the leave?

Malika Riley
January 24, 2019                                          58

1    three with an operations employee, an operator, from

2    before my leave.

3        Q.   Okay.  The one that you're describing where the

4    employee was terminated, does any of that jog your

5    memory as to whether or not it was the engineering

6    group, the lab group, or an operator?

7        A.   He was in the engineering group.

8        Q.   And then the other two that you're thinking or

9    recalling that may have been going on between October

10   and November 2016, the other two investigations, one of

11   them being the lab group, do you recall whether or not

12   that investigation was completed before your

13   termination?

14       A.   I don't recall.

15       Q.   And then I know you said the third one it could

16   have been an operator.  Do you recall if that

17   investigation was completed?

18       A.   Yes.  That one was prior to my going -- I

19   believe that was prior to my going out on leave.

20       Q.   Okay.  And so the engineering one is the one

21   that you think the employee was terminated that you

22   -- we had just been discussing, and that was ongoing at

23   the time of your termination, correct?

24       A.   Correct.

25       Q.   The lab investigation, you said you don't

Malika Riley
January 24, 2019                                          59

1    remember if that one was completed before your

2    termination; is that correct?

3        A.   Correct.

4        Q.   And then this third one, you think that was

5    actually an investigation that occurred before you went

6    out on leave?

7        A.   Yes, ma'am.

8        Q.   And so that would have been before October or

9    November 2016 --

10       A.   Yes, ma'am.

11       Q.   -- that that one was going on, correct?

12       A.   Yes, ma'am.

13            MS. WILLIAMS:   Okay.  Do you want to take

14   a quick break?

15            MS. SPROVACH:   Perfect timing.

16            THE WITNESS:   Yes.

17            MS. WILLIAMS:   Yes.

18            MS. SPROVACH:   Thank you.

19            THE VIDEOGRAPHER:   We're off the record

20   at 11:40.

21            (Break.)

22            THE VIDEOGRAPHER:   We are on the record

23   at 11:58.

24       Q.   (BY MS. WILLIAMS)  Ms. Riley, we've just taken

25   a short break.  Are you ready to resume?

1    A.    Yes.

2    Q.    Is there anything about your testimony thus far

3  that you want to revisit or change for any reason?

4    A.    No.

5    Q.    Okay.  We were kind of on a line of questioning

6  about some of your duties that led us to talk about

7  your experience with investigations.  I want to go

8  back, though, to the time that you started at CP Chem

9  in January of 2015.  What was your compensation at that

10  time?

11    A.    I believe it was 90 -- 95,000.  Between 90 and

12  95,000.

13    Q.    Okay.  And did -- did you participate in a

14  bonus plan?

15    A.    Yes.

16    Q.    And you had benefits as well?

17    A.    Yes, ma'am.

18    Q.    Okay.  From -- how long was Julie Fleet your

19  supervisor at CP Chem?

20    A.    For a little over a year before Melissa got

21  there.

22    Q.    So from January 2015 until approximately when

23  -- January 2016 was Julie Fleet your supervisor?

24    A.    Yes.

25    Q.    Okay.  And Melissa Simpson became your

Malika Riley
January 24, 2019                                                    61

1    supervisor in February of 2016 approximately?

2        A.    Yes.   I believe that's when she transferred

3    from Saudi Arabia --

4        Q.    Okay.

5        A.    -- to Cedar Bayou site.

6        Q.    Okay.   Do you know why Julie Fleet left Cedar

7    Bayou?

8        A.    If I recall correctly, they moved her to the

9    corporate office at The Woodlands to take on a

10   different role within HR, and that made an opportunity

11   available for Melissa Simpson to transfer back to the

12   States.

13       Q.    Okay.   Was Julie -- to your knowledge, was

14   Julie Fleet still employed at the company at the time

15   of your termination?

16       A.    Yes.

17       Q.    Have you talked to her about your lawsuit?

18       A.    No.   I haven't.   I reached out to Julie Fleet

19   shortly before I was terminated to ask if she knew any

20   reason why I was experiencing some of the things that I

21   was experiencing or if she could help provide me

22   guidance on what I should do with some of the concerns

23   I was facing.

24             At that time I also reached out to legal

25   that I had worked with during the course of my

Malika Riley
January 24, 2019                                                65

```
1     Q.    And you did not speak to them at any point --

2     A.    No, ma'am.

3     Q.    -- in connection with that?

4     A.    Correct.

5     Q.    Okay.  During the time that Julie Fleet was

6   your supervisor, do you have any complaints in this

7   lawsuit about that period of time?

8     A.    No.

9     Q.    How would you describe Julie Fleet as a

10  supervisor or manager based on your experience?

11    A.    Based on my experience, I thought Julie was a

12  great manager.  She was very open.  She communicated

13  well.  She made it a point to get to know her employees

14  and understand their needs and concerns, and she was

15  very engaged.  At any given time I could go to her in

16  her office, and I felt comfortable talking with Julie.

17  She showed me support.  So I had no concerns with the

18  way Julie's man- -- with Julie's management style at

19  all.

20    Q.    How did you learn that Julie would be moving

21  from Cedar Bayou to another position?

22    A.    Julie communicated that to the team.

23    Q.    In a group setting?

24    A.    Yes, ma'am.

25    Q.    When she communicated this to you, did she also
```

Malika Riley
January 24, 2019                                                    66

1   indicate to you who would be replacing her?

2       A.    Initially, no.  I don't think she knew or at

3   least she did not communicate that to the team.  It

4   wasn't until shortly before her departure to The

5   Woodlands location that it was disclosed that Melissa

6   would -- Melissa Simpson would be transferring from the

7   Saudi Arabia site to Cedar Bayou.

8       Q.    And so that would have been the first time that

9   you learned that Melissa Simpson was coming into the

10  role?

11      A.    Yes, ma'am.

12      Q.    Did you know anything about Melissa Simpson at

13  that point?

14      A.    No.  I didn't, other than what others that had

15  previously worked with her in some capacity

16  communicated.  I did not know her personally.  I had

17  maybe one or two conversations with her about positions

18  for employees that had transferred to her location in

19  Saudi Arabia or vice verse to Texas to Cedar Bayou.

20      Q.    Okay.  That -- that would have been while she

21  was in Saudi Arabia?

22      A.    Yes, ma'am.

23      Q.    Those communications, was that by e-mail, by

24  phone, what -- what method?

25      A.    Both.

Malika Riley
January 24, 2019                                    67

1        Q.    Okay.

2        A.    And it was related to concerns that one of her

3    employees had at the time, Sam Mondragon.  There was

4    something that had been done incorrectly, and I picked

5    up on it and assisted him.  She reached out to me

6    initially and apologized for any miscommunication or

7    error on his part, and I assured her that it was not a

8    problem and however I could help.  And that was my very

9    first time talking with her over the phone.

10       Q.    Okay.  Did you gather an impression about her

11   from that interaction at all one way or the other?

12       A.    I didn't.  I -- I thought she seemed pretty

13   nice over the phone.  It was not a long conversation.

14   It was a brief conversation, and I really didn't have

15   any impression at that point in time.

16       Q.    You also said that you had heard things from

17   others about Melissa before she came on as the HR

18   manager.  What things had you heard from others about

19   Melissa before she started as HR manager?

20       A.    My HR assistant, Rita Tolleson, had

21   communicated that she worked with her previous at CP

22   Chem in another capacity before Melissa had become an

23   HR manager and communicated that she was -- she was

24   okay, that she's -- she's hard.  She can be difficult

25   at times, but otherwise she thought everything would go

Malika Riley
January 24, 2019                                                      68

1    smoothly with the transition.

2              She didn't elaborate either way whether

3    or not she thought Melissa would fit in well with our

4    group or whether those in the group would be very

5    receptive to her.

6              Also other conversations with my peers

7    were that Melissa was very close to Marcela and they

8    were pretty much best friends and that you don't cross

9    Melissa and you don't cross Marcela because it might

10   not be beneficial to your career.

11             And I received similar feedback from --

12   from others at Cedar Bayou that at some point in time

13   had worked with Melissa before, and it was not positive

14   in nature, the feedback that I received.

15   Q.    Okay.  So the communications that you got from

16   your peers about Melissa, that was before Melissa

17   started?

18   A.    Yes.

19   Q.    And they told you she was close to Marcela.

20   You shouldn't cross Melissa or Marcela because it might

21   not be beneficial to your career; is that right?

22   A.    Yes.

23   Q.    What else, if anything, did they tell you about

24   Melissa before she started?

25   A.    I was told that she may not be the easiest

Malika Riley
January 24, 2019                                                    69

```
 1   person to work with, and that's really all I can recall
 2   at this time.
 3       Q.   Who were the peers that shared this with you
 4   about Melissa?
 5       A.   Kristin Cothren, Chris Reed, and Adam Sainato.
 6   And that was it.
 7       Q.   What -- did you understand that they were
 8   basing these comments on prior working experience that
 9   they had with her, or that that was her general rep --
10   reputation?
11       A.   It was prior -- both.
12       Q.   Okay.
13       A.   Prior work experience and the general
14   reputation.
15       Q.   And based on their experience and her general
16   reputation, they believe that Melissa was difficult to
17   work with?
18       A.   Yes.
19       Q.   Across the board?
20       A.   Yes.
21       Q.   And then you said you heard similar things from
22   others at Cedar Bayou that were not positive about
23   Melissa; is that right?
24       A.   Yes.
25       Q.   Who were these others that you heard similar
```

1    things about at -- at Cedar Bayou?

2        A.    The operations manager at the time, and one of

3    our operations meetings, it was just hisself [sic],

4    myself, and some of the superintendents.  He had worked

5    with her in a past experience, and it was known that

6    their relationship was not good.  There was not good

7    feelings between Melissa towards Tom and towards --

8    from Tom towards Melissa, and everyone was quite aware

9    and wondered how things were going to turn out as Tom

10   Sessions was the operations leader and Melissa was

11   coming to the site as the HR manager.

12       Q.    Uh-huh.

13       A.    So there was a lot of apprehension amongst HR

14   employees, amongst operations employees.  And it was

15   known that Melissa wasn't the easiest person to get

16   along with and --

17       Q.    Okay.  Other than Tom Sessions, can you recall

18   anyone else at Cedar Bayou who expressed these concerns

19   or opinions about Melissa?

20       A.    I know that there were -- it was communicated

21   to me that there were issues between Melissa and Julie

22   Fleet prior to Melissa coming.  There were some

23   personal issues that transpired between them is -- is

24   what I'm -- was told, and they were not fans of each

25   other.  And it was quite evident when Melissa got

Malika Riley
January 24, 2019                                72

1   presence.  You could sense that there was tension, that

2   they didn't want to be in the same room, but the -- it

3   wasn't a warm and fuzzy feeling.

4              Julie was very short in her turnover with

5   Melissa, and the same with Melissa.  Just based on my

6   knowledge and what I witnessed, Melissa was somewhat

7   upset because she didn't feel like Julie did the proper

8   turnover with her before transferring to The Woodlands.

9       Q.   She expressed that to you, Melissa did?

10      A.   She did not say it to me, but I overheard the

11  conversation.

12      Q.   Who -- to whom was Melissa speaking when you

13  overheard that conversation?

14      A.   Kristin Cothren.

15      Q.   Okay.

16      A.   And Kristin also confirmed that in a

17  conversation that we had.

18      Q.   So based on what you were hearing before you

19  actually started working with Melissa, it sounds like

20  there were a lot of people who had the opinion that

21  Melissa was difficult to work with; is that right?

22      A.   Yes, ma'am.

23      Q.   Did anyone ever give you any specific examples

24  of issues that they had with Melissa other than just

25  generally describing that she was difficult to work

1    with or not the easiest person to work with?

2        A.   Yes, ma'am.

3        Q.   Okay.   What were some of the specific examples

4    you got and from whom?

5        A.   From my peers, Kristin Cothren and Chris Reed.

6        Q.   Okay.   What did Kris- -- Kristin tell you about

7    her interactions with Melissa?

8        A.   Kristin said that Melissa is very difficult,

9    that she has expectations of her team that are

10   sometimes unrealistic.   Kristin returned from her

11   medical leave after having a very serious surgery,

12   prematurely, and suffered some setbacks of her

13   own.   She was very upset and communicated to me that

14   she felt she didn't have a choice but to return for

15   fear of something happening or Melissa being unhappy

16   with her for being out.

17            She was originally supposed to, under

18   doctor's orders, be out approximately two to three

19   months after her procedure.   And she came back maybe a

20   month and a half and suffered several medical setbacks

21   because of it.

22       Q.   Did she say that Melissa forced her to come

23   back?

24       A.   She didn't say "forced," but it was very

25   apparent to her that she felt like she couldn't receive

Malika Riley
January 24, 2019                                        74

1    the proper recuperation and healing before she had to

2    come back.

3         Q.    Did her doctor clear her to come back to work

4    early?

5         A.    I believe so.

6         Q.    Okay.  So she said her doctor medically thought

7    she could come back, but then she felt some type of

8    pressure to come back?

9         A.    Before she even came back, she did feel the

10   pressure to come back.

11        Q.    Okay.  But Melissa never actually demanded that

12   she come back.  Is that your understanding?

13        A.    Not to my knowledge.

14        Q.    Okay.  Were you at Cedar Bayou when this

15   occurred?

16        A.    Yes, ma'am.

17        Q.    Okay.  What time frame was that?

18        A.    It was before my leave.

19        Q.    Okay.

20        A.    I want to say May or June.

21        Q.    So Kristin went out on leave sometime around

22   May or June?

23        A.    I believe so, yes.

24        Q.    And was gone for about a month and a half.  So

25   she came back in either June or July?

Malika Riley
January 24, 2019                                    75

1    A.    She came back maybe two weeks -- two or three

2    weeks before I went out.   Kristin also made comments

3    that she felt like she never could do anything right

4    with Melissa and that Melissa's expectations were

5    unrealistic and that at times she could be harsh and

6    not always fair in the way that she does things.

7    Q.    Okay.  Anything else that Kristin described

8    about Melissa to you?

9    A.    There were several things, but that was some of

10   the things that really come to mind.   I know Kristin

11   did make a comment to me before I went on leave or

12   comments to me before I went on leave as well as after

13   I got back that she was looking for another job.   She

14   was going to quit if things continued down the road and

15   Melissa stayed at Cedar Bayou.

16            And that was pretty much a consensus.

17   Everyone on the team felt like they just couldn't --

18   she was just so hard to work with and for.   She was

19   very different from Julie.   Chris Reed expressed the

20   same concerns, but he just said, "I'm just going to try

21   to do whatever I can to get on her good side because I

22   fear not being on her good side."   And that was pretty

23   much the consensus throughout the group.

24   Q.    And so I just want -- the specific example you

25   gave me about Kristin, that's all that you can recall

Malika Riley
January 24, 2019                                              76

1    right now about any specific interaction or issues she

2    had with -- with Melissa?

3        A.   Yes, ma'am.  The only other thing, Melissa

4    would call her a lot on her off time, and she always

5    felt like she had to be there and had to be working.

6    She made the comment that because Melissa didn't have

7    kids and she was newly married that she expected that

8    everyone else should operate like she operates and

9    should be, you know, devoted and committed to the job

10   around the clock is how others felt.

11       Q.   Did you say "how others felt"?

12       A.   Yes.  Kristin and -- and Chris.

13       Q.   Okay.

14       A.   As well as Jill, the admin assistant; Rita, and

15   Rita retired early as a result.

16       Q.   So Jill -- what's Jill's last name?  I'm sorry.

17       A.   Oh, goodness.  I don't remember Jill's last

18   name.  She was the HR assistant.

19       Q.   Okay.  That's fine.  If it comes to you, just

20   let me know.  Otherwise we'll stick with Jill.

21       A.   Okay.

22       Q.   And she was an admin assistant, correct?

23       A.   Yes, ma'am.

24       Q.   Okay.  And Rita Tolleson, you said they

25   basically agreed with all of this, that she -- that

Malika Riley
January 24, 2019                                    77

```
 1   Melissa expected everyone to be devoted and around the
 2   clock?
 3      A.   Right.
 4      Q.   Did they give you any specific examples of
 5   issues or problems they had with Melissa Simpson, Jill
 6   and/or Rita?
 7      A.   Rita stated that, you know, she felt that
 8   Melissa was very demanding in what she asked for at
 9   times, and she felt stressed, like she had to go above
10   and beyond to appease Melissa, very similar to the way
11   that all of us felt.
12           Jill -- I know that there was one point
13   in time where Jill feared that Melissa was going to
14   fire her, that she was concerned about not meeting
15   Melissa's expectations, and she thought that they were
16   unrealistic at times.  And she was trying to do
17   everything that she could to keep Melissa happy so that
18   she didn't get on her bad side.
19      Q.   Okay.  Was Rita still there when you were
20   terminated?
21      A.   Yes, ma'am.  She had gone out on a medical
22   leave, and she was on leave at the time that I was
23   terminated.
24      Q.   Did Rita report directly to you or directly to
25   Melissa or someone else?
```

Malika Riley
January 24, 2019                                              78

1      A.   She reported directly to Melissa, but she

2  supported me and my client group.

3      Q.   And what about Jill?

4      A.   Jill reported directly to Melissa, and she

5  supported Chris Reed and his client group.

6      Q.   Was Jill the equivalent of Rita for Chris

7  essentially?

8      A.   Yes, ma'am.

9      Q.   Got it.   Okay.   Okay.   Did Chris Reed ever give

10 you any specific examples of issues or problems that he

11 had with Melissa Simpson?

12     A.   Yes.   When Melissa got there, Chris felt as

13 though -- what he communicated to myself and Kristin as

14 well was that he could do no right with Melissa.   He

15 didn't understand what her problem was with him.   He

16 felt that Melissa didn't like him for whatever reason,

17 so he had to be creative in finding ways to try to stay

18 on her good side.

19          And Kristin did tell me that when Melissa

20 got there that she thought -- Melissa had told her that

21 she thought that Kristin and I do more work and produce

22 more than Chris, and she didn't know how long that was

23 going to last.

24     Q.   What did you take that to mean, "didn't" --

25 "didn't know how long that was going to last"?

1  with me, I told her, I said, "Melissa, for everything

2  in this performance improvement plan, I have pause

3  with.  I have concerns because this is not" -- "a lot

4  of this is not true."  And I did explain to her that I

5  did not agree with the performance improvement plan.

6          But she assured me that if I just signed

7  it and if I just went through the plan, everything

8  would be fine.  I did not put up a fuss.  I did not

9  fight with her about it.  That wasn't my place as the

10  subordinate.  But she knew full well -- Chris Reed was

11  in on that meeting.  I stated I did not agree with it.

12  Q.  Okay.  You said it took her a while to get the

13  document together.  What do you mean "a while"?

14  A.  It took --

15  Q.  You knew that you were getting the PIP, but

16  then it took a while to actually get the document?

17  A.  Well, she communicated to me -- I want to say

18  it was days before that she wanted to have a meeting

19  with me.  She didn't state exactly what it was at the

20  time, but when we got in to the meeting, it sounded

21  like -- when -- when we initially met before the actual

22  PIP meeting --

23  Q.  Uh-huh.

24  A.  -- she did state that she was going to be

25  putting me on a performance improvement plan or coming

Malika Riley
January 24, 2019                                                    83

1    up with ways to work with me to help correct issues or

2    concerns.  But she never stated verbatim what those

3    were.

4               So naturally when I got the document in

5    front of me that she put together, I was shocked.  I

6    was -- I was completely shocked, especially since I had

7    received accolades before.  I hadn't had any other

8    disciplinary conversations or letters or anything

9    before prior to being put on a performance improvement

10   plan.

11              And as an HR professional for years, I

12   didn't understand that because in every company that

13   I've worked for, we -- it was never a shock to an

14   employee.  There was always steps that led up to

15   progressive discipline.

16       Q.   Uh-huh.

17       A.   I had never had any of that from Julie, from

18   Melissa to that point or from anyone else.

19       Q.   So from the time that Melissa became your

20   supervisor in February 2016 until the time that you

21   were sitting in the meeting and she presented the PIP

22   with you, is it your testimony that she had never

23   talked to you about any type of performance issues she

24   thought you were having?

25       A.   She had not talked to me based on the

Malika Riley
January 24, 2019                                          85

1   Kristin and Chris would come to you and tell you that

2   they had meetings with Melissa where Melissa told them

3   about performance issues that she thought each of them

4   was having; is that right?

5       A.   Yes.  As well as myself.

6       Q.   Melissa shared with Kristin and Chris what

7   performance issues you were having; is that right?

8       A.   Yes.  Correct.  Yes.

9       Q.   And it's your testimony that Melissa, between

10  the time that she became your supervisor and the time

11  that you received the PIP document, she had never had

12  similar conversations with you about any performance

13  issues she thought you were having?

14      A.   Correct.

15      Q.   Okay.  Between the time that Melissa became

16  your supervisor and the time that you were placed on

17  the PIP, had you made any mistakes in performing your

18  job duties?

19      A.   Yes, ma'am.  I had made mistakes.  And -- and I

20  own the mistakes that I made, but they weren't anything

21  different than the mistakes that my peered -- my peers

22  had communicated to me that they had made and

23  communicated to me that she had talked to them about.

24      Q.   So she was telling them -- she was telling

25  Chris and Kristin that "Malika is making A, B, C

Malika Riley
January 24, 2019                                              86

1    mistakes"?

2        A.    Correct.

3        Q.    Correct?

4        A.    Yes, ma'am.

5        Q.    She never came to you and said, "Malika, I

6    think you're making A, B, C mistakes"; is that right?

7    Is that your testimony?

8        A.    No.  That is not correct.

9        Q.    Okay.

10       A.    At -- at some point or another we did discuss

11   that I had made a mistake, whether it was typing up a

12   memo or communication and she found errors in it or if

13   I brought it to her attention that I made a mistake, we

14   did discuss that.  But it wasn't in a disciplinary

15   fashion to where I felt as though it would lead up to a

16   performance improvement plan.

17       Q.    How soon after Melissa became your supervisor

18   do you recall her expressing any issues she had with

19   your performance?

20       A.    I'm sorry.

21       Q.    Whether she was bringing to your attention

22   mistakes that she thought you made or she was

23   correcting something that you did, how soon after she

24   became your supervisor did you have -- do you recall

25   having that type of conversation with her?

Malika Riley
January 24, 2019                                                                87

1      A.    Before having that conversation, it may have

2   been maybe a month before she put me on the improvement

3   plan.

4      Q.    Does -- do you recall getting placed on the

5   performance improvement plan near the end of June 2016?

6      A.    Yes, ma'am.   Shortly before my surgery.

7      Q.    Okay.   And it's your testimony that the first

8   time Melissa had ever pointed out to you any type of

9   mistake or concern she had about your performance was

10  in May of 2016?

11     A.    To my recollection it was between May and the

12  point in time in which she put me on that plan.   And it

13  was -- it was minor errors, and I -- I recall thinking,

14  "Why am I getting dinged on this?"   It was a simple

15  honest, mistake that I was quick to correct and

16  address, and it's not anything different than mistakes

17  that my peers have made.

18     Q.    Okay.   So the -- the mistake or mistakes that

19  Melissa pointed out to you for the first time in May of

20  2016 that you say were minor errors, what -- what were

21  those mistakes that she pointed out to you?

22     A.    I don't remember all of the things that we

23  discussed during that time, but I think there were

24  errors on some communications, e-mails that I had sent

25  to just her, that -- grammatical errors on -- on one of

Malika Riley
January 24, 2019                                              88

```
 1    the forms -- oh, goodness.  On some of the form,
 2    errors, that we use in our recruiting process, I
 3    believe, there were errors there.
 4              I don't remember exactly, but they
 5    weren't egregious in nature.  They weren't things that
 6    -- that would lead someone to believe they're justified
 7    for a performance improvement plan.  I -- I didn't -- I
 8    didn't have any significant errors where somebody got
 9    paid incorrectly.  I didn't have any significant errors
10    where I violated policy or it would result in
11    disciplinary action for me at all, not even verbal
12    conversations to where I knew that this is pretty
13    serious, it could result in further disciplinary
14    action.  It was just -- it seemed like minor things.
15         Q.   They were minor to you; is that right?
16         A.   Yes, ma'am.
17         Q.   Did they appear to be minor to Melissa when she
18    communicated with you about them?
19         A.   It was framed in a manner by Melissa that this
20    -- these were the -- the errors, and it -- it -- it
21    seemed minor.  She -- she didn't seem upset or -- or
22    like it was a major issue or -- or incident in -- in
23    our dis- -- I took it as a learning -- a coaching even.
24    I -- I did not take it any -- in any way that I thought
25    it would result in a performance improvement plan.
```

Malika Riley
January 24, 2019                                    89

1    Q.   And, again, we're talking about a conversation

2    that you say that you had with Melissa in May of 2016?

3    A.   I believe that was the time frame, May -- it

4    would have to have been in that time frame prior to me

5    being placed on a performance improvement plan.

6    Q.   Okay.

7    A.   May or June time frame.

8    Q.   Okay.  And the mistakes that Melissa pointed

9    out to you in this May 2016 discussion, when were those

10   mistakes made in relation to that discussion?  Had --

11   were they recently made mistakes, or they -- were they

12   things from earlier in the year?

13   A.   They were -- they were recent.  She -- she got

14   there, I believe, mid to late February.  And we really

15   -- really didn't start working on anything together

16   until maybe March, April time frame.  And then I want

17   to say in -- in May or -- or early June, if it would

18   have been in that time frame if she would have

19   mentioned anything --

20   Q.   Okay.

21   A.   -- that I can recall.

22   Q.   So between February, when she started as your

23   supervisor, and May of 2016, were you making any type

24   of mistakes in performing your job duties?

25   A.   Of course.  I -- I've made -- I made my fair

U.S. LEGAL SUPPORT, INC
713-653-7100

Malika Riley
January 24, 2019                                              90

1    share of mistakes.

2         Q.    What kind -- type of mistakes were you making

3    between February and May of 2016 before you had this

4    conversation with Melissa about your mistakes?

5         A.    Between February when she got there to May, I

6    really can't recall anything other than e-mail

7    communications.  If she would -- and she was a

8    stickler.  If -- if she sent you an e-mail and you

9    responded back, if you didn't start with "hi," the word

10   "hi," H-I, then she was upset about that or it was

11   communicated that "You need to start all of your

12   e-mails with 'hi.'"  And I was baffled and I know my

13   peers were -- they were baffled as well.  They didn't

14   understand.  What difference does it make?

15        Q.    That was something that she demanded of all?

16        A.    Everyone.

17        Q.    You, Kristin, and Chris and everyone else in

18   the department?

19        A.    In HR, correct.

20        Q.    Okay.  Was -- was your omission of the word,

21   "hi," in e-mails a point raised in any discussion you

22   had with her or in your PIP as something that you did

23   wrong?  Was she -- did she include that as a part of

24   the PIP or --

25        A.    No.  She didn't.

1   me that I could reach out to her for help on anything

2   that I needed.  So naturally I reached out to her, and

3   then I was scolded by Melissa and told not to for

4   whatever reason.

5            But those are things that she would deem

6   as mistakes or things that I'd done wrong that I didn't

7   understand how I had done anything wrong, and I stated

8   to her, "I never said that about Marcela."

9        Q.    Uh-huh.

10       A.    And I didn't understand why she was accusing

11  me.  She could have come to me and just asked me did I

12  state this.

13       Q.    Okay.

14       A.    And she didn't.

15       Q.    Okay.  And so to -- to clarify, in May of 2016

16  when she pointed out the mistakes that she thought you

17  were making --

18       A.    Uh-huh.

19       Q.    -- she only pointed out the grammatical errors

20  in some of your e-mail communications, the conversation

21  that Adam Sainato had where he told her that you said

22  Marcela was a holdup in a particular process, and then

23  where she told you not to communicate with corporate,

24  that you have to get her clearance first.  Those were

25  the only three things in May of 2016 that she pointed

1    out to you as concerns she had about your performance;

2    is that correct?

3         A.    Yes, ma'am.  That I can recall.

4         Q.    Okay.  And before that, you had not had any

5    other conversations with her at all regarding any

6    performance issues you had.  Is that your testimony?

7         A.    Correct.

8         Q.    Okay.  And then after the May 2016

9    conversation, you-all then had a follow-up discussion

10   before the actual PIP meeting where she talked to you

11   again about some performance issues; is that right?

12        A.    It was a follow-up discussion -- well, it was

13   the discussion prior to her actually putting me --

14   where she communicated to me that she would be looking

15   at ways to help me improve.  She did not state a

16   performance improvement plan at that time, but she said

17   that she would be getting everything -- because I asked

18   her for it.

19              I said, you know, "Can you give me

20   specific details as to what you're referring to or who

21   said" -- you know, what did I do wrong basically.  And

22   she stated that she was still putting the information

23   -- documenting the information and she would schedule a

24   meeting for us to go over it.

25              And at that meeting, that's when she

Malika Riley
January 24, 2019                                            97

1   prevented -- presented me with a performance

2   improvement plan with a list of things that I had no

3   knowledge of and -- and didn't understand why they were

4   even on a performance improvement plan.

5      Q.   Okay.   And I'll -- we're going to look at the

6   performance improvement plan in just a minute, but my

7   recollection is that the -- you were presented -- or

8   the date of the performance improvement plan is

9   June 28th, 2016.   Does that sound about right?

10     A.   Yes.

11     Q.   Okay.   And it's your testimony that before

12  June 28th, 2016 -- sometime between the discussion you

13  had in May of 2016 and before June 28th, 2016, you and

14  Melissa had a conversation where she told you she would

15  be coming up with ways to help you; is that right?

16     A.   Yes.

17     Q.   Okay.   And that conversation happened about a

18  week before you actually had the meeting where she

19  presented you with the -- the PIP?

20     A.   Yes.   About a week or so before as I recall.

21     Q.   And it's your testimony that the things you

22  recall being on the PIP were things that you had no

23  idea were ever any issue in terms of your performance;

24  is that right?

25     A.   Correct..

Malika Riley
January 24, 2019                                                  102

1      A.    She may have observed that on one or two

2   occasions at most.

3      Q.    Okay.  And kind of going back to the beginning

4   of the time that Melissa became your supervisor, early

5   on, did you have any particular issues with her in

6   terms of, you know, your interactions with her from the

7   time frame, let's say, February until May?  How were

8   you and Melissa getting along during that time frame?

9      A.    I don't recall any issues with Melissa.  I'm --

10   I'm a very accommodating person.  However I can help

11   anyone, I'm always trying and willing to help.  I --

12   there's nothing that I can think of that would have

13   been a strain on our relationship.  I would try to go

14   out of my way to appease Melissa or make her happy so

15   that I could stay on her good side.

16      Q.    And so from February until May, were you and

17   Melissa getting along okay?

18      A.    I thought so.

19      Q.    Did you have any issues with her for any reason

20   between the time period of February 2016, when she

21   started as your supervisor, and May of 2016, when she

22   first talked to you about mistakes you were making?

23      A.    Issues that I can recall revolve around

24   concerns where I needed to leave.  One instance I

25   needed to leave to take my mother to one of her doctor

Malika Riley
January 24, 2019                                              103

1   appointments for an upcoming knee surgery.

2       Q.   Uh-huh.

3       A.   I had scheduled with Melissa as I would make it

4   a practice to do in advance so that she knew and had it

5   on the schedule.  At times I sensed that she would get

6   frustrated when I would request to use vacation.  I

7   worked, it seemed like at times, around the clock.  I

8   was always working, so I didn't think it would be an

9   issue if I needed to leave early on a day.  But I had

10  worked over the weekend or I had put in the time

11  somewhere else as an exempt employee.  That would

12  happen commonly.

13           But there was a time shortly after she

14  got there -- I want to say it was in March.  It was

15  basketball season.  I received a call from the school,

16  the nurse, that my son had injured himself, and I

17  needed to go and get him.  And we found out that he had

18  fractured his hand.  He had a break in the middle of

19  his hand, and he had to have therapy.

20           I went in to Melissa's office and I said,

21  "Melissa, I have to leave."  I said, "My son was

22  injured.  Is it okay?  The work that I have to do I

23  will take home with me.  I'll get it done."  And she

24  looked at me, and she said, "Well, can't your husband

25  take off and go take your son or go get him and take

Malika Riley
January 24, 2019                                    105

1   to Julie, and I wanted to give Melissa that same

2   courtesy to let her know and so we could start planning

3   for who would take my responsibilities while I was out

4   on leave.  I -- I provided her that information.  And I

5   felt like after that she just was -- had issues with me

6   because of the situation, I guess.  I really didn't

7   know.

8                  I stated that to Chris and Kristin, "I

9   don't know.  I just feel like Melissa doesn't like me

10  or that she has something against me.  I don't know

11  what it is."  And -- and they -- they couldn't help me.

12  They -- they didn't know either.

13       Q.   Okay.

14       A.   But they noticed it.

15       Q.   So your mother's doctor's appointment, what

16  time frame was that?

17       A.   That was in -- I believe that was in late

18  March, early April --

19       Q.   Okay.

20       A.   -- time frame.

21       Q.   And your testimony is that you sensed that

22  Melissa got frustrated.  Did she say something to you

23  specifically that she was frustrated that you were

24  asking to take time off to take your mom to an

25  appointment?

Malika Riley
January 24, 2019                                          106

1      A.    It was her demeanor and the way that she

2   responded to my request.

3      Q.    But she never said anything to you that she was

4   frustrated about you?

5      A.    No.

6      Q.    Okay.  And you were able to take that time off,

7   correct?

8      A.    Yes.

9      Q.    And then with respect to your son, she asked

10  you if your husband was available to take your son, but

11  she ultimately said to go ahead and take the time off;

12  is that right?

13     A.    Yes.

14     Q.    Okay.  I think you identified these in response

15  to a question I asked, whether or not you had any

16  issues at all with -- with Melissa between the time

17  frame of February and May of 2016.  Do you recall that?

18     A.    Yes.

19     Q.    Okay.  So the issues that you've had with --

20  you had with Melissa during that time frame all

21  centered around requests that you had to take time off

22  from work?

23     A.    I believe that those had a lot to do with

24  Melissa having reservations with me.  Other reasons as

25  to why, I -- I don't recall or I can't speak on.  But

Malika Riley
January 24, 2019                                    107

1   those are the things that stand out to me.

2       Q.   And that -- I just want to make sure that I

3   have an understanding that between that time frame, to

4   the extent you and Melissa had any issues between

5   February and May, from your perspective, they were all

6   related to requests that you made to take time off from

7   work; is that correct?

8       A.   Yes, ma'am.

9       Q.   You can't think of any other conflict that

10  you-all might have had during that time frame; is that

11  correct?

12      A.   No.

13      Q.   Okay.  That is correct?

14      A.   That is correct.

15      Q.   Okay.  All right.  Did you ever have an

16  occasion where you requested time off with Melissa that

17  she denied the request?

18      A.   Not that I can recall.

19      Q.   There were actually -- between the time period

20  of February and May -- multiple times where you

21  requested either to leave early or to take time off --

22      A.   Uh-huh.

23      Q.   -- for various reasons, correct?

24      A.   Yes.

25      Q.   And on all of those occasions, Melissa

1   ultimately approved it, and you were able to take the

2   time off, correct?

3       A.   Correct.

4       Q.   Okay.  When did you talk to Melissa about

5   having to take time off in July for your medical leave?

6       A.   Shortly after she arrived at the site, so it

7   would have been March time frame.

8       Q.   And did you speak to her in person about that?

9       A.   Yes, ma'am.

10      Q.   At the time -- and was it in your office or her

11  office?  Do you recall?

12      A.   I don't recall.

13      Q.   Okay.  Were you two the only individuals

14  present during that discussion?

15      A.   Yes.

16      Q.   Okay.  At the time that you first communicated

17  to Melissa around March of 2016 that you were taking

18  time off in July of 2016, had your request for leave

19  already been approved by the company?

20      A.   Can you restate it, the question?

21      Q.   Sure.  When you first talked to Melissa to

22  notify her that you were going to be taking leave in

23  July of 2016?

24      A.   Uh-huh.

25      Q.   You talked to her in March of 2016 about taking

Malika Riley
January 24, 2019                                    109

1    leave in July, correct?

2        A.    Correct.

3        Q.    Okay.  When you had that conversation with her

4    in March, had your request to take leave in July

5    already been approved by the company?

6        A.    I don't recall if it had been approved by UPMC,

7    which was our leave administrator.

8        Q.    Uh-huh.

9        A.    But Julie -- I had communicated it to Julie

10   well before Melissa got there.

11       Q.    Uh-huh.

12       A.    And she had approved that I was fine to take

13   that time and I would just need to work with the new

14   manager and get everything squared away for who would

15   cover my role and responsibilities while I was out and

16   start preplanning for that.

17       Q.    Okay.  When you talked to Melissa in March of

18   2016 about your leave in July of 2016, what did -- what

19   did you tell her?

20       A.    I believe I sent the e-mail and communication

21   -- the e-mail communication to her prior to my

22   discussion with her.  I may have even given her a

23   heads-up that I was going to have to have surgery and

24   then followed it up with the e-mail.  I'm sorry.  Did I

25   answer your question?

Malika Riley
January 24, 2019                                    110

1      Q.   I'm not sure.  Let's -- we'll go back and -- so

2    the first time you communicated with Melissa about

3    having to take leave was in March 2016, correct?

4      A.   Yes.

5      Q.   You think that that initial communication may

6    have been by e-mail or in person?

7      A.   I think it was both.  I either spoke with her

8    about it, gave her the heads-up, or I followed up with

9    the e-mail -- and I followed up with the e-mail or I

10   sent her the e-mail, and then I followed up with a

11   conversation.

12     Q.   Okay.  But all of that would have taken place

13   in March?

14     A.   Yes, ma'am.

15     Q.   Okay.  And when you followed up with her --

16   well, did she respond to the e-mail to your

17   recollection?

18     A.   I recall that she did respond to one of my

19   e-mails about needing to take leave, and her response

20   was that we just needed to make sure that Chris or

21   Kristin -- that we -- we meet to discuss who would be

22   taking what responsibilities in my absence.

23     Q.   Did you have any problems with that response

24   from Melissa?

25     A.   No.

Malika Riley
January 24, 2019                                          111

1     Q.    You thought that was appropriate?

2     A.    Uh-huh.

3     Q.    Okay.  "Yes"?

4     A.    Yes.  Sorry.

5     Q.    That's okay.  You're doing great.  And when you

6     spoke to her in person about your leave, either

7     initially or as a follow-up to the e-mail, what did she

8     say to you in person about your leave request?

9     A.    I don't recall that she said anything about it.

10    I know that she was okay with it.  She didn't seem to

11    have a problem with it, but she did reiterate that we

12    just need to make sure that the work is covered and

13    that they're -- nothing falls through the cracks and

14    that Chris or Kristin line out what they're responsible

15    for.  We'd have to come up with a game plan.

16    Q.    Okay.  And between that time, March of 2016

17    when you had the initial conversation with her

18    notifying her that you were taking leave and then the

19    time that you took leave, did you have any other

20    communications with her about the fact that you were

21    taking leave?

22    A.    Not other than e-mails that may have been sent

23    where I stated, "We're getting closer to time.  This is

24    what I'm doing to ensure that these things are taken

25    care of by Chris or Kristin.  I've met with them."

Malika Riley
January 24, 2019                                    112

1    Just communicating what my plans were to cover the work

2    while I was out.

3        Q.    And in response to those communications, did

4    she ever say anything that you thought was negative

5    about the fact that you were taking leave?

6        A.    Not that I can recall.  I did communicate a

7    certain time frame in which I thought I would be on

8    leave --

9        Q.    Uh-huh.

10       A.    -- because she did ask me, "How long do you

11   think you'll be out?"  I could tell from that question

12   that she was concerned about the workload for Chris and

13   Kristin because they were already overwhelmed with what

14   they were working on.

15            And it seemed as though she was concerned

16   that my workload would be more than they could handle,

17   and she wanted to make sure that I communicated how

18   long I anticipated I would be out and all the

19   responsibilities that would need to be covered.

20       Q.    Did you think that there was anything

21   inappropriate about her asking you about the

22   anticipated length of your leave to make sure that

23   coverage was coordinated appropriately?

24       A.    No.  I didn't.

25       Q.    Okay.  What did you tell her at that time about

1   your anticipated -- the anticipated length of your

2   medical leave?

3        A.    I told her basically what my discussions with

4   my physician, that generally the type of surgery that I

5   was having, the foot surgery, I'd be out six to eight

6   weeks, if there were no complications.  However, if

7   there were complications, it might be longer.  But I

8   told her, "I don't anticipate having any complications,

9   so it should be fine."  I was thinking optimistically

10  because I refused to think any other way, but

11  unfortunately it didn't turn out that way.

12       Q.    And so before you took leave, based on the

13  discussions you had with Melissa, it was her

14  understanding then that you would be out for six to

15  eight weeks if there were no complications, correct?

16       A.    Yes, ma'am.

17       Q.    And she communicated with you and you

18  communicated with her to just make sure that coverage

19  was coordinated among your peers to pick up your

20  workload while you were out on leave; is that right?

21       A.    Yes, ma'am.

22       Q.    Did you-all talk about your leave -- before

23  your leave did you and Melissa have any other

24  communications about your leave?

25       A.    Not that I can recall other than those e-mail

1    communications and the times that we met to discuss and

2    go over turnover for my leave. .

3        Q.    Okay.  At any point did Melissa -- before you

4    took leave, did she try to suggest that your leave

5    should be shorter than the anticipated six to eight

6    weeks?

7        A.    Not that I can recall.

8        Q.    Did she say anything that left -- made you feel

9    pressure to return before six to eight weeks if -- if

10   that's the length of your leave?

11       A.    Well, she did stress that, "There's a lot going

12   on and, you know, we need everyone.  We need the whole

13   team."  But just to make sure that the work is covered

14   in preplanning.  But she stress -- it's -- it's kind of

15   the way that her delivery made me feel like I should do

16   everything that I can to try to get back sooner than

17   later.  And then I already knew Kristin's experience.

18       Q.    Uh-huh.

19       A.    So the apprehension was already there that I

20   don't want to be out longer than I have to because it

21   might pose an issue for me.

22       Q.    So when she stressed that a lot was going on,

23   was -- was that true?  In fact, was there a lot going

24   on in your group at the time?

25       A.    Yes.

Malika Riley
January 24, 2019                                              115

1     Q.    Okay.

2     A.    There was quite a bit.

3     Q.    And then your workload being distributed among

4  your peers would have added to their workload, correct?

5     A.    Correct.

6     Q.    And as a manager, do you think that was a

7  legitimate concern that she had, just making sure that

8  the volume of work that you-all had in the department

9  was appropriately covered to service your clients?

10    A.    Yes.

11    Q.    Okay.  And was it true, in fact, that to

12 operate, you know, at -- at an optimum that the entire

13 team was needed?

14    A.    Yes.

15    Q.    Okay.  When you said -- I think you said she

16 told you that, you know, kind of -- or encouraged you

17 to get back as soon as you could, right?

18    A.    Uh-huh.

19    Q.    "Yes"?

20    A.    Yes.

21    Q.    Is there anything wrong in your mind with her

22 saying, "Get back as soon as you can"?

23    A.    Knowing what I knew at the time, I felt that it

24 -- it was -- I felt pressured to do everything that I

25 could to get back.  And I know how -- the expectation

Malika Riley
January 24, 2019                                    116

1    that was set for Kristin and how she felt and how we

2    discussed that she felt and was made to feel by

3    Melissa.

4        Q.   But the expectation was to get back as soon as

5    you can, not sooner than you can, correct?  What she

6    said to you or whatever she conveyed to you led you to

7    believe that she wanted you to return as soon as you

8    could, cor- -- correct?

9        A.   Yes.  Correct.

10       Q.   Not sooner than you could?

11       A.   I felt pressured to get back as soon as I

12   could, even if that meant sooner than I should -- than

13   my doctor might recommend that I need to.

14       Q.   Well, you would have had to have been cleared

15   by your doctor in order to come back, right?

16       A.   Right.

17       Q.   And presumably your doctor would clear you when

18   you could return, right?

19       A.   Right.

20       Q.   And what Melissa said to you, however she

21   conveyed that to you, was to get back when you could,

22   right?

23       A.   Yes.

24       Q.   Okay.  Okay.  I think we were talking about

25   discussion -- tho- -- are those all the communications

1    that you recall having with Melissa about your leave

2    before you went out on leave?

3        A.    Yes.

4        Q.    Okay.  And then you -- you took your leave in

5    July of 2016, correct?

6        A.    Correct.

7        Q.    And it was originally intended to last until

8    August of 2016, for about six or eight weeks; is that

9    right?

10       A.    Yes, ma'am.

11       Q.    Between July and August of 2016, I want to

12   break it down because I -- I do recognize, you know,

13   from your case that you had intermittent leave and some

14   things changed during your leave.

15             But between July 2016 and August 2016

16   were you out full time on leave?  In other words, you

17   were not -- between July 20 -- July 2016 to August 2016

18   you had not been cleared to do -- to perform any work

19   during that initial part of your leave?

20       A.    Between July and August, I -- I don't recall

21   because I had a laptop, and even though I was on

22   medication, I was sedentary, so I could respond to

23   e-mails or I could respond to phone calls from clients

24   or the team.  So I -- I -- I believe that sounds like

25   it could be correct that that was the time frame that I

Malika Riley
January 24, 2019                                                    118

1    was on full leave.  I -- I don't recall exactly.

2        Q.    Yeah.  And I -- I just want to make sure that

3    it's -- that -- that I'm clear.  There was a period of

4    time where you were on leave, not performing any work

5    at all?

6        A.    Yes.

7        Q.    Correct?

8        A.    Yes.

9        Q.    And at some point you were cleared to do some

10   work from home, correct?

11       A.    Yes.

12       Q.    For a certain number of days a week; is that

13   right?

14       A.    Yes.

15       Q.    Okay.  The time that you were basically not

16   doing any work was approximately July when you first

17   went on leave and then sometime in August of 2016; is

18   that right?

19       A.    Yes.

20            MS. WILLIAMS:  Okay.  Did you guys want

21   to take a quick break?

22            MS. SPROVACH:  Yeah.

23            MS. WILLIAMS:  Okay.

24            THE VIDEOGRAPHER:  We're off the record

25   at 1:25.

Malika Riley
January 24, 2019                                    119

1              (Break.)

2              THE VIDEOGRAPHER:  We are on the record

3    at 1:56.

4       Q.    (BY MS. WILLIAMS)  Ms. Riley, we just took a

5    short break.  Are you ready to resume your deposition?

6       A.    Yes.

7       Q.    Is there anything from your testimony up until

8    the break that you'd like to revisit or change?

9       A.    No, ma'am.

10      Q.    Okay.  Great.  We were talking about the time

11   period that you were on leave, and I think we'd gotten

12   to the point where you confirmed there was a period

13   sometime between July and August where you were on

14   full-time leave where you weren't performing any work,

15   correct?

16      A.    Yes.

17      Q.    At some point you were cleared to perform some

18   work from home, correct?

19      A.    Yes.

20      Q.    Do you recall roughly the time frame that you

21   were cleared for that work, for part-time work?

22      A.    I believe it was late September through my time

23   of return in October.

24      Q.    Okay.  Between August and September, were you

25   on -- had you been released to do part-time work from

Malika Riley
January 24, 2019                                        120

```
1    home during that time frame to your recollection?
2        A.    Between August and September, I believe I was,
3    and it was for a very short period of time.  That was
4    after -- maybe it was shortly before my complications,
5    I believe.
6        Q.    And then after you had those complications, you
7    essentially went back on full-time leave where you
8    weren't performing any work -- is that correct -- until
9    about late September?
10       A.    I -- I believe so.
11       Q.    Okay.  Let's back up a little bit and talk
12   about your medical leave itself.  What specifically did
13   you go out on leave for?
14       A.    I went out on leave to have foot surgery.
15       Q.    Okay.  And during your leave, as we just
16   mentioned, you had some complications, correct?
17       A.    Correct.
18       Q.    When did those complications arise?
19       A.    I believe it was late July, early August.
20       Q.    And what were those complications?
21       A.    I suffered blood clots, DVT, and pulmonary
22   embolisms that traveled from my calf through my thigh
23   up into both my lungs.
24       Q.    And DVT is deep vein thrombosis?
25       A.    Vein thrombosis, yes, ma'am.
```

Malika Riley
January 24, 2019                                              124

1    your status while you're out on leave?

2         A.    Yes, ma'am.

3         Q.    And you did that with Melissa when you were out

4    on leave in 2016?

5         A.    Yes, ma'am.

6         Q.    How did you update Melissa about your status

7    while you were on leave?

8         A.    I updated her via e-mail.  I updated her via

9    phone call, and I updated her via -- via text.

10        Q.    Did you do -- use one of these methods more

11   often than the other?

12        A.    More often I used phone and text.

13        Q.    Okay.  And what would be the nature of the

14   updates you provided to her by e-mail, phone, or text?

15        A.    I provided her updates based on conversations

16   with my physician that I was progressing, or when the

17   complications arose, I provided her an update from the

18   emergency room when I was admitted letting her know

19   that I was having complications and I would keep her

20   updated as to my status.

21        Q.    Okay.  And how did Melissa respond to you?  And

22   I mean that in two ways.  First of all, did she respond

23   to you by e-mail or over the phone or text when you

24   provided these updates to her?

25        A.    Yes.

1    A.    No.  That's not what I --

2    Q.    Okay.

3    A.    -- I'm saying.  It just seemed at certain

4    instances that her concern was more about the workload

5    and me getting back to work.  She did ask how I was

6    doing on occasion.

7    Q.    So after your complications, she did inquire

8    about how you were doing, correct?

9    A.    Yes.

10   Q.    And then she was also inquiring after your

11   complications about the status of your return?

12   A.    Correct.

13   Q.    As a manager and somebody who's an HR

14   professional, do -- do you understand why she might be

15   interested in knowing the -- the length of any, you

16   know, additional leave that you would have to take

17   since she had to -- they had to kind of manage the --

18   the workload --

19   A.    Sure.  I can --

20   Q.    -- for your client groups?

21   A.    Sure.  I can understand that, and I was very

22   proactive with letting her know every step of the way

23   updates as to my appointments with my doctor and how

24   things were going.  So it wasn't that she wasn't

25   getting regular updates from me as to when I or my

Malika Riley
January 24, 2019                                        131

1   and peers to not reach out and not make an employee

2   feel like they're pressured to return to work.  And I

3   don't feel that I was given that same courtesy.

4       Q.   So when you provided her updates and she

5   responded to your updates, you thought that that was

6   inappropriate for her to do, to respond to your

7   updates?

8       A.   No.  I -- I thought it appropriate that she

9   should respond to my updates.  How --

10      Q.   She should not have asked you when you thought

11  you might be returning to work.  That was -- that's the

12  part that you thought was inappropriate?

13      A.   That I considered as a little insensitive

14  because I felt like she was asking in a way that "When

15  are you going to be returning?  We have all this

16  stuff.  We're having to cover your work."  It wasn't

17  just -- just to inquire as to when I thought I would be

18  able to.  It had more context of "I need you back

19  here.  I want you back."  And I felt pressured.

20      Q.   So when she inquired about the status of your

21  return, in making -- in that communication, she

22  specifically said to you, "We have a lot of work.  I

23  need you back here."  Those were her words?

24      A.   No.  She didn't specifically state that but --

25      Q.   You just felt like that was the tone --

Malika Riley
January 24, 2019                                          132

1              MS. SPROVACH:  Hold -- hold on.  Just let
2      her -- let her finish.  Are you finished?
3              THE WITNESS:  Yeah.
4              MS. SPROVACH:  Okay.
5      Q.   (BY MS. WILLIAMS)  She did not specifically
6      state that, correct?
7      A.   Correct.
8      Q.   You felt like that's what she was conveying to
9      you?
10     A.   Yes, ma'am.
11     Q.   But she never said that specifically, correct?
12     A.   She did ask when I thought I would be returning
13     to work.
14     Q.   But she never specifically said, "We need you
15     back here.  We have a lot of work going on."  She never
16     said those things to you, correct?
17     A.   She said that there was a lot going on.  She
18     said that Chris and Kristin, their workload has
19     increased, so she did allude to the fact that "We need
20     you back because there's" -- "they're" -- "they're
21     overwhelmed with the workload, and your workload is
22     causing them, I guess, more problems or more stress."
23     Q.   So she alluded to those things --
24     A.   Yes.
25     Q.   -- by telling you that Chris and Kristin were

Malika Riley
January 24, 2019                                          133

1    busy?

2       A.   Yes.

3       Q.   Okay.  How -- those communications where she

4    made -- alluded to those things, were those e-mail

5    communications?

6       A.   Those were via conversation.  Those were via

7    phone conversation.

8       Q.   So the -- the only times that she ever said to

9    you something that alluded to the fact that you thought

10   she wanted you to get back to work was in a phone

11   conversation; is that right?

12      A.   Yes.

13      Q.   During the same time, though, you were

14   communicating with her by e-mail and text messaging

15   about your -- your status and your updates?

16      A.   At some point during that time, it was more so

17   via text.  Eventually it was via e-mail when I was able

18   to get back to my -- not full duty but kind of

19   part-time duty.

20      Q.   Okay.  In the text messages and the e-mails did

21   she ever allude to the fact that, you know, that they

22   were really busy and in a way that made you feel

23   pressured to get back to work?

24      A.   In -- not in -- not so much in a text message.

25   In the e-mails, she stated on a call with me -- we had

1   regularly scheduled calls where I would provide her

2   updates on where I was at on things and things that

3   Kristin would need to pick up or Chris.  And she made

4   the comment to me, "I need you to help Kristin with

5   this or to take on these responsibilities because

6   Kristin has to focus her attention on these other

7   things."

8                And it was conversations like that that

9   made me feel like I needed to get back because, again,

10  I just -- I felt pressured like I was being put on the

11  spot because my workload wasn't getting done or it was

12  becoming burdensome or cumbersome on my peers.  And she

13  was looking out for their best interests and she needed

14  me back to work so that I could relieve some of the

15  workload off of them.

16      Q.   Okay.  And there was an e-mail exchange, you

17  said, where she conveyed something like this to you?

18      A.   Yes, ma'am.

19      Q.   Do you recall approximately when that was?  Was

20  that -- let me narrow it a little bit.  Was that after

21  you had been released to do some part-time work from

22  home?

23      A.   Yes, ma'am.

24      Q.   Okay.  So you were already actively back

25  performing some work when she was talking to you about

Malika Riley
January 24, 2019                                              135

1   relieving Kristin's workload; is that right?

2       A.   Yes, ma'am.

3       Q.   Okay.  If you were released to -- already

4   released to perform some work, why were you feeling

5   pressure that she was trying to get you to come back to

6   work sooner in that context?

7       A.   Because that's how she made me feel, that she

8   needed me there, she needed my presence.  In the state

9   -- in the phone conversation with her and Chris, she

10  said, "Why can't you just come back to work and prop

11  your leg up?  You know, we have a trash can.  We can

12  put it under your leg and prop your leg up if that's

13  what you need."

14      Q.   She said that in the conversation where she and

15  Chris contacted you --

16      A.   Correct.

17      Q.   -- about some activities -- personal activities

18  you had been engaged in while you were on leave, right?

19      A.   Yes, ma'am.

20      Q.   I'm focusing on the conversation that the --

21  the exchange where you said that she was asking you to

22  basically take some load off of Kristin after you'd

23  been released to return to perform part-time work.  Why

24  did you feel like she was pressuring you to return at

25  -- at that time?

Malika Riley
January 24, 2019                                                137

```
1    restricted from going up the stairs.  I had to remain
2    on the -- the bottom floor because I couldn't take the
3    elevator in the event of an emergency if it went out.
4    I did still have to elevate my leg because of the
5    swelling, and I was still seeing -- receiving treatment
6    and therapy for my foot.
7        Q.   Were you released in October to full-time work
8    with those restrictions?
9        A.   Yes.  Yes, ma'am.
10       Q.   Did anyone at the company do anything to
11   interfere with the restrictions that you had when you
12   returned to work, or were you able to -- to meet all of
13   those restrictions?
14       A.   No one interfered.
15       Q.   And so when you were released to full-time work
16   in October, did you and Melissa resume your discussions
17   about your PIP at that time?
18       A.   Yes, ma'am.
19       Q.   Was your PIP extended?
20       A.   As I recall, Melissa stated that we would
21   resume on the PIP after I returned to work.  And once I
22   returned in October, we did resume conversations, and
23   she commented that -- that she could see that I was
24   making the necessary improvements.  And I didn't think
25   that there was any issue.  I was delivering as
```

Malika Riley
January 24, 2019                                                138

1    expected, I was under the impression.  That's why it

2    was such a shock when I was terminated.

3        Q.    And when you returned in October -- so you

4    understood that your PIP was for a specific period of

5    time, correct?

6        A.    Correct.

7        Q.    Do you know what that time was?

8        A.    Three months.

9        Q.    Okay.  So it was supposed to last three months

10   starting in June, but you went out on leave, correct?

11       A.    Correct.

12       Q.    When you returned in -- in October, was the PIP

13   extended to account for the time that you were out on

14   leave?

15       A.    That was my understanding.

16       Q.    Okay.  And so the extended period of the PIP,

17   what is your understanding as to when it was extended

18   to?

19       A.    I thought that I would have a full three months

20   from the time that I went out at the end of June, when

21   I was placed on the PIP, until I returned and could

22   complete the three-month time frame in which I was told

23   I would be given.

24       Q.    Were you given a new end date for the PIP when

25   you returned from leave in October?

Malika Riley
January 24, 2019                                    139

1      A.    I don't recall.  I bel- -- I believe so, but I

2   -- I don't remember.

3      Q.    Okay.  You don't recall when that end date was?

4      A.    No, ma'am.

5      Q.    Okay.  And so bet- -- when you were out on

6   leave full time and the time you were released for

7   part-time work, there was no issue at all between you

8   and Melissa with respect to your PIP from your

9   perspective.  You guys didn't discuss it, and she did

10  not bring it up; is that correct?

11     A.    Correct.  That's how I remember it.

12     Q.    When you resumed the PIP when you returned in

13  October, did you-all resume having regular meetings

14  about the PIP to discuss your -- and check in on your

15  performance?

16     A.    Yes.

17     Q.    Okay.  Okay.  I want to go -- I want to do this

18  here.

19                (Marked Riley Exhibit No. 1.)

20     Q.    (BY MS. WILLIAMS)  I'm going to let your lawyer

21  take a look at this really quickly, and then we'll pass

22  that onto you.

23     A.    Okay.

24                MS. SPROVACH:  I've got one.

25     Q.    (BY MS. WILLIAMS)  Ms. Riley, we've handed you

Malika Riley
January 24, 2019                                    142

1      Q.   Okay.  Are there any parts of this document

2    that you completed, or is this all information that

3    Melissa completed, to your -- to your knowledge?

4      A.   This is all information Melissa completed.

5      Q.   Okay.  Under the PIP, you were required to meet

6    with Melissa on some -- a regular schedule to discuss

7    your progress; is that right?

8      A.   Yes.

9      Q.   You-all -- did you-all have any meetings with

10   respect to the PIP before you -- okay.  After June 28

11   but before you went out on leave, did you and Melissa

12   have any meetings with respect to the PIP itself?

13     A.   Not that I recall.  I was told to provide a

14   document that stated what I would do to correct her

15   concerns that were placed in the PIP before my --

16   before the date of -- of my surgery, before I went out

17   or on that day, I believe, is what I recall.  I had to

18   provide that to her.

19     Q.   And you submitted that to her?

20     A.   Yes, ma'am.

21     Q.   Did you-all meet and -- to discuss any of that

22   before you went out, or did you just submit the

23   document to her?

24     A.   I just submitted the document per her request.

25     Q.   Okay.  And then when you came back from leave,

```
1    how -- how soon after your return in October did

2    you-all resume your meetings about the PIP?

3         A.   I believe it was in -- maybe two weeks after I

4    returned.   It wasn't immediate that I recall.

5         Q.   Were you responsible for scheduling meetings to

6    review your progress on the PIP, or was Melissa

7    responsible for that?

8         A.   I believe I was responsible for that.

9         Q.   How often were you supposed to meet with

10   Melissa to discuss your progress on the PIP?

11        A.   I believe it was weekly.

12        Q.   And did you meet with her weekly?

13        A.   As I -- I recall correctly, on -- when I

14   returned, the week that I returned, she -- I went to

15   schedule a meeting with her, and she told me, "Let's

16   just hold off maybe another week or so," until I got

17   settled in.   And then I was told that I could go ahead

18   and -- and schedule resuming our meetings.

19        Q.   Okay.   From that point when -- forward, when

20   the meetings resumed until the time of your

21   termination, did you meet with Melissa on a weekly

22   basis to discuss your progress on the PIP?

23        A.   Yes.

24        Q.   Okay.   Did anybody else attend those meetings

25   with you and Melissa?
```

Malika Riley
January 24, 2019                                    146

1   execution of personnel announcements?

2       A.    In the June 28th meeting?

3       Q.    Yes.

4       A.    I -- I do recall personnel announcements coming

5   up in that discussion, and my response to her was there

6   was only one personnel announcement that I could even

7   recall at that time that she was able -- that was the

8   only example that she was able to provide.

9       Q.    Had you committed some error with respect to

10  personnel announcements?

11      A.    I believe -- I believe so.  Again, it would

12  have been a minor error, no different than any of my

13  peers have ever had the same -- have ever committed

14  with regard to personnel announcements.

15      Q.    Okay.  And do you recall there being multiple

16  personnel announcements including with respect to an

17  employee by the name of Azad Khan?

18      A.    Azad, I don't recall exactly.  He may have been

19  one of the new grads or interns, but I don't recall.  I

20  don't recall making an error or -- or even the -- the

21  situation around Azad's personnel announcement.

22      Q.    What about Jeff Leblanc?

23      A.    Jeff Leblanc, I don't recall that one either.

24      Q.    Okay.  You do recall there being some error on

25  your part with respect to personnel -- at least one

Malika Riley
January 24, 2019                                                    162

1    you ever prepare any -- any documents related to those

2    weekly meetings to -- to go over your -- your

3    performance?

4         A.    I -- by habit, I took notes, so I would have

5    spiral notebooks where I would take notes at every

6    meeting based on the discussion between myself and

7    Jennifer and my clients --

8         Q.    Uh-huh.

9         A.    -- or anyone else that I had discussions with.

10        Q.    Okay.  You mentioned something -- and we talked

11   a little bit about the operations group and the

12   technical group, but I don't think I've gotten it on

13   the record clearly.  At some point after Melissa became

14   your supervisor, you were reassigned from the technical

15   -- I'm sorry -- from the operations group to the

16   technical group, correct?

17        A.    Yes.  Correct.

18        Q.    Did -- was Melissa the person who informed you

19   of that reassignment?

20        A.    Yes.

21        Q.    Did you have any problems or concerns or issues

22   with that reassignment?

23        A.    I was concerned because my background and

24   experience speaks to operations.  Even as a generalist

25   I was well rounded with other client groups, but I was

Malika Riley
January 24, 2019                                    163

1    told by Julie that I was hired specifically to work

2    with the operations group based on my background.

3              So I was a little bit concerned, and in

4    conversations with Melissa, she stated it's just to

5    give Jen -- to give Kristin Cothren an opportunity to

6    see a different side, to give her developmental

7    opportunity and an opportunity to give me exposure to

8    another client group being technical.

9              It was never brought to me or explained

10   that there were any issues in my performance and that's

11   why I was being moved.  Kristin explained the same

12   thing to me because she was a little taken back.  She

13   had always had technical.  She was comfortable with

14   technical, and she confided in me that she had

15   apprehensions about taking on operations because it was

16   such a large client group and she never had to work

17   with them.

18   Q.   Okay.  Did you at any point become aware that

19   Melissa moved you to technical to -- to support the

20   technical group for other reasons other than what

21   you've just described?

22   A.   No, ma'am.

23   Q.   Okay.  So to this day your understanding is

24   that she moved you in order to give you an opportunity

25   to develop your skills --

Malika Riley
January 24, 2019                                          164

1     A.    My --

2     Q.    -- see a new client group?

3     A.    Yes, ma'am.  My skills and as an opportunity

4    for Kristin as well.

5     Q.    Okay.  When you were placed on the PIP, did you

6    complain to anyone internally at CP Chem about the PIP?

7    And let me -- let me kind of tighten that up a little

8    bit.

9              I'm not talking about your peers.  But in

10   terms of making a formal complaint that you thought the

11   PIP was unfair or inappropriate for any reason, did you

12   raise any of those complaints when you were placed on

13   the PIP?

14    A.    Other than my peers, which I know I did have

15   conversations with Kristin and Chris, I don't recall

16   having conversations with anyone else just out of

17   embarrassment and concern with the validity of it.  I

18   just wanted to execute on it and get it out of the way,

19   get it behind me so that I wouldn't have to worry about

20   it in my future going forward with the company.  I had

21   every intention on being with this company, retiring

22   and -- and having a good long career with Chevron

23   Phillips.

24    Q.    So you never complained about the unfairness of

25   the PIP to anybody formally at CP Chem; is that right?

Malika Riley
January 24, 2019                                    178

1     A.    And at that point in time I did communicate to

2  Melissa that I was going to have to continue my therapy

3  and that I had consulted with another doctor, and I was

4  going to have to have the metal plate in my foot

5  removed.

6              And she knew exactly what was going to

7  transpire and what would have to take place and that I

8  would need potentially to be out on leave again to have

9  it removed in December.  And then at the end of

10 November I was terminated.

11    Q.    Okay.  When did you communicate with her about

12 the procedure that was planned for December?

13    A.    When I got back.

14    Q.    So in October?

15    A.    Yes, ma'am.

16    Q.    Okay.  And how did you communicate with her

17 about that?  In person, by e-mail, some other means?

18    A.    Both.

19    Q.    Okay.  Did she respond to you?

20    A.    I believe she responded to the e-mail,

21 but there were other things in that e-mail that I'm

22 thinking about.  And I know that she responded in the

23 face-to-face meeting where I told her about it, and she

24 said, "Okay."  I did tell my peers as well so in -- you

25 know, to prepare them that I would potentially have to

Malika Riley
January 24, 2019                                           189

1    he -- he pretty much -- Chris -- Chris was more quiet

2    on the phone than Melissa.  But he had -- he did

3    interject and -- and just asked if I could understand

4    how it is a concern for them.

5        Q.    What did you respond?  Did you -- did you

6    understand how it might be a concern based on the

7    information they had before they called you and their

8    understanding about your medical leave, why there might

9    be a concern about those activities?

10       A.    Well, I thought that if there were a concern,

11   that it would have been better received if she had, as

12   my manager, had reached out to medical and found out

13   what my restrictions were before I felt like I was

14   being accused, falsely accused, and I felt like I was

15   being interrogated.

16       Q.    Did she raise her voice during the call?

17       A.    It was elevated.

18       Q.    Okay.  She was yelling at you?

19       A.    No.  She wasn't yelling.  But I could hear the

20   concern and somewhat frustration in her voice.

21       Q.    Okay.  Generally, though, do you understand

22   that the company would have an interest in

23   understanding whether an employee who's out on leave is

24   engaging in conduct that's consistent with the leave

25   and the restrictions that the employee is on during the

Malika Riley
January 24, 2019                                          190

```
 1   leave?
 2              MS. SPROVACH:  Objection to the extent an
 3   answer requires a legal conclusion; speculation,
 4   assumes facts not in evidence.  Go ahead.
 5      Q.   (BY MS. WILLIAMS)  You can answer.  That's one
 6   of those times where she objects to it, and I told you
 7   you'd still be able to answer.  So that's okay.
 8      A.   Okay.  So I --
 9      Q.   You can answer the question.
10              MS. SPROVACH:  You can -- I told you I
11   will make it incredibly clear --
12      Q.   (BY MS. WILLIAMS)  Yeah.  You'll know if she
13   says don't answer.
14      A.   Okay.  I do feel that, again, my manager should
15   have contacted medical and sought information on my
16   condition and what my restrictions were before
17   contacting me.  I understand that there's things as a
18   manager that you need to know, but there's also things
19   as a manager that you don't need to know.  And you
20   should leave that to medical professionals to
21   determine, and certainly I would never even in my roles
22   as a manager, I would never call an employee and make
23   them feel the way that I felt in that conversation.
24      Q.   And my -- my question is a little bit
25   broader.  I understand that you have an issue, I guess,
```

Malika Riley
January 24, 2019                                    191

1   with the -- the method, right.  You don't -- you take

2   issue with the fact that Melissa contacted you and

3   Chris contacted you to inquire about this, correct?

4       A.   Correct.  I have concerns.

5       Q.   My question is:  From the company's perspective

6   -- Chevron Phillips is your employer -- do you

7   understand that they had a legitimate interest to make

8   sure that your activities during your leave were

9   consistent with your leave and the medical restrictions

10  that you were under during your leave?

11            MS. SPROVACH:  Same objections.

12      A.   I understand that there's a need for managers

13  to know certain things, yes.  But to be -- to accuse an

14  employee of something and not have all the facts and

15  information, I have concerns with that.

16      Q.   (BY MS. WILLIAMS)  Okay.  Do you have concerns

17  that Chevron Phillips Chemical, as your employer, would

18  want to make sure that your conduct during your leave

19  was consistent with the restrictions and the terms of

20  your leave?

21      A.   I do understand that.  However, I wasn't doing

22  anything inconsistent or that would have or should have

23  made them believe that I was doing something under

24  false pretenses or that would not have been acceptable

25  or outside of my restrictions.

1   leave?

2            MS. SPROVACH:  Object -- objection,

3   vague.

4       A.   I -- I can't answer that question.

5       Q.   (BY MS. WILLIAMS)  Why not?

6       A.   Can you repeat it?  It was -- I don't know that

7   I fully understand what you're asking.

8            MS. WILLIAMS:  Can you read it back

9   please?

10           (The requested portion was read back.)

11      Q.   (BY MS. WILLIAMS)  I can see why you might be

12  confused about that, so I'm going to fix that.

13      A.   Okay.

14      Q.   Do you think that Chevron Phillips Chemical, as

15  your employer, had an interest in confirming whether or

16  not you were engaged in conduct that was consistent

17  with the terms of your medical leave and your

18  restrictions?

19           MS. SPROVACH:  Same objection.

20      A.   I -- I could understand the need to -- for my

21  employer to want to ensure that I'm -- I'm following

22  the requirements of my leave.  However, I would expect

23  my employer to do their due diligence and get the facts

24  before they call just based on assumption and hearsay.

25      Q.   (BY MS. WILLIAMS)  Do you know whether -- did

1    you ask Melissa or Chris whether or not they had done

2    any other due diligence before they called you?

3        A.    No.  I didn't.

4        Q.    Do you know whether they did before they called

5    you?

6        A.    No.  I don't.

7        Q.    And certainly apart from whatever due diligence

8    you think they should have done, talking to you would

9    have been another part of this process, right, to get

10   your side of the story, correct?

11       A.    Correct.

12       Q.    Okay.  You just think it should have been

13   somebody other than Melissa and Chris to contact you to

14   inquire about this, correct?

15       A.    Correct.  I -- I wouldn't advise my clients or

16   managers.  I completely advise against contacting an

17   employee on an approved medical leave to question the

18   validity of activities that they're engaged in,

19   especially accusing -- in an accusing manner that

20   they're doing something wrong.

21       Q.    Okay.  After the -- the call that you had with

22   Melissa and Chris, did the issue about your activities,

23   the Texans football game, your son's football game, or

24   the -- the class reunion -- I understand that didn't

25   come up necessarily in the conversation, but did -- did

Malika Riley
January 24, 2019                                           195

1    any of that surface again after this phone call?

2         A.    No.

3         Q.    Okay.   And approximately when was the phone

4    call?

5         A.    I believe it was late September -- mid to late

6    September.

7         Q.    So they had this one phone call with you, and

8    then after that one phone call, you never heard about

9    this issue again; is that right?

10        A.    Correct.   Not from Chris or Melissa.

11        Q.    From anyone?

12        A.    There were discussions with my peers at the

13   time.

14        Q.    You had discussions with your peers about the

15   phone call?

16        A.    Yes.

17        Q.    And when you say "at the time," what time are

18   you talking about?

19        A.    I believe it was a week or so after everything

20   transpired.

21        Q.    After the call transpired?

22        A.    After, yes, ma'am.

23        Q.    Were you back at work when these discussions

24   happened, or were you still on leave?

25        A.    I was still on leave.

Malika Riley
January 24, 2019                                    197

1   at home, working from home.  So I did push --

2        Q.   When were you supposed to return to work?

3        A.   My doctor, Dr. Scott McKinney, wanted me to

4   take another few weeks and return late October.  But I

5   pushed to return early October.

6        Q.   Do you recall when you returned?

7        A.   I believe it was October 4th, 2016.

8        Q.   And that's when you were back in the office?

9        A.   Yes, ma'am.

10       Q.   Okay.  Does October 11th sound more accurate to

11  you?

12       A.   Yes.  I believe I was originally supposed to

13  return October 4th, and my doctor didn't want to

14  release me.  And I pushed, and he said, okay,

15  October 11th I could go back.

16       Q.   Okay.  And so your doctor thought you were

17  physically capable of returning to work on October 11?

18       A.   He didn't want me to return because I had a

19  boot on my foot and he -- I was on blood thinners.  And

20  his concern was that if I fell, it could re- -- it

21  could cause me further complications.  And the foot was

22  still swelling significantly.  So he knew that there

23  would be discomfort, and I was still on medication for

24  pain at that time.  And he didn't want me to operate a

25  vehicle, but I can --

Malika Riley
January 24, 2019                                    198

1      Q.   And he still released you to -- to return to

2  work despite all of this -- these concerns?

3      A.   I -- yes.  I convinced him that I would take

4  the pain medicine after I got off, and if it was

5  unbearable that I could request to -- to leave early.

6  And I did let Melissa know and UPMC that there may be

7  times that even if I come in, if I started feeling bad,

8  I would need to leave.

9      Q.   And what did Melissa say about that?

10     A.   I -- I believe she was okay with it.  She was

11  just glad that I was getting back into the office.

12     Q.   Okay.  Did Melissa ever request that you

13  shorten your medical leave to return to work?

14     A.   She did not request it.

15     Q.   Did she ever demand it?

16     A.   No.  She did not demand it.

17              MS. WILLIAMS:  Okay.  Can we take a break

18  so I can --

19              MS. SPROVACH:  Sure.

20              THE VIDEOGRAPHER:  We're off the record

21  at 4:00 o'clock.

22              (Break.)

23              THE VIDEOGRAPHER:  We are on the record

24  at 4:17.

25     Q.   (BY MS. WILLIAMS)  Ms. Riley, do you recall --

Malika Riley
January 24, 2019                                                  199

1     do you recall the date that you were informed of your

2     termination?

3         A.    I believe it was November 28th of 2016.

4         Q.    Was that the last day that you worked --

5         A.    Yes.

6         Q.    -- at Chevron Phillips Chemical?

7         A.    Yes, ma'am.

8         Q.    Do you recall when your last PIP meeting was in

9     relationship to the November 28th termination meeting?

10        A.    I believe it may have been a week or two weeks

11    before.

12        Q.    The last -- do you have a recollection

13    specifically of the last PIP meeting you had before the

14    termination meeting?  It coming to mind to you as we

15    sit here today?

16        A.    I remember that it was -- I think it was

17    rescheduled because of one of the investigations or a

18    meeting or something that Melissa had to attend, so we

19    had to reschedule it.  But I don't remember the context

20    of the conversation.

21        Q.    Okay.  Did you-all have any discussions in that

22    last meeting regarding the status of your performance

23    in any of the areas identified in the PIP?

24        A.    I don't recall that coming up in the

25    conversation, although I made it a point in each of our

Malika Riley
January 24, 2019                                    200

1    meetings to request feedback from Melissa on how things

2    were going and how I was progressing.  And the feedback

3    that I received was positive.

4        Q.   Did you get any feedback at all that you

5    thought was negative?

6        A.   Not that I can recall.

7        Q.   Do you recall having a discussion with Melissa

8    sometime around November 14th where Melissa had

9    requested that you give her specific and detailed

10   information and numbers to support your efforts in --

11   in certain areas with respect to your PIP items?

12       A.   Numbers as in absences or hours or --

13       Q.   Just anything where she was -- you -- you

14   either had to report to her about, you know, the

15   substance of -- or summary of the status of your

16   activity in certain areas or the volume of -- of

17   information that you were handling for certain items

18   under the PIP?

19       A.   I vaguely remember conversations about one of

20   the investigations that I was working on and having to

21   produce a lot of information on where we stood with the

22   employee that was being investigated and a status

23   update at that time.  But that's the only thing that I

24   recall at this time.

25       Q.   Around the time of November 2016, were you

Malika Riley
January 24, 2019                                              207

1    talked to her face to face?

2        A.    That may have been the case if that e-mail was

3    sent stating that his injury had taken place the -- the

4    day before.  I just don't recall exactly.

5        Q.    Okay.  And then sometime around February 25th,

6    you had an appointment with the hand surgeon.  You

7    notified her that you would have to take some time off

8    for that?

9        A.    Correct.

10       Q.    And she approved that, correct?

11       A.    Yes, ma'am.

12       Q.    And you also at that time told her that you

13   were going to be submitting a leave of absence request

14   for March 7th due to you mom's procedure.  She approved

15   that as well, correct?

16       A.    Yes, ma'am.

17       Q.    And then on March 24th, 2016, you requested to

18   leave early, and Melissa asked you to provide some more

19   details about why you were leaving early.  And you

20   informed her that you had to take one of your pets to

21   the vet; is that correct?  Do you remember that?

22       A.    Yes.

23       Q.    And she approved that as well?

24       A.    Yes.  She did approve it, but I think there was

25   some hesitancy even in that e-mail.

Malika Riley
January 24, 2019                                                      208

1       Q.   Right.  And her hesitancy was trying to figure

2   out what the -- why you would be leaving early because

3   initially you did not inform her that it was related to

4   your pet's issue, correct?

5       A.   I believe so.

6       Q.   Okay.  And when she responded, she said it was

7   okay for you to leave early to take care of your pet.

8   Is that your recollection?

9               MS. SPROVACH:  Can you show her the

10  e-mail?  Do you want --

11              MS. WILLIAMS:  Yeah.  Sure.

12              THE WITNESS:  Yes.

13              (Marked Riley Exhibit No. 5.)

14              MS. SPROVACH:  Thank you.

15              MS. WILLIAMS:  Uh-huh.

16      Q.   (BY MS. WILLIAMS)  And it's two pages

17  Bates-numbered Riley 26 and Riley 27.

18      A.   Okay.  Yes.  That's correct.  During that time

19  Melissa was very, very hard to get in touch with.  So

20  she was either in her -- in meetings or her door was

21  closed so it was hard for me to just go over and say,

22  "Hey, Melissa, I have this going on."  So I would try

23  to send an e-mail or follow up with her whenever I

24  could catch her.  But, yes, I -- I did make that

25  request, and she did approve it.

1      A.    No.

2      Q.    And then when you revealed that it was in order

3  to take your pet to the vet, she said that was fine?

4      A.    Yes.

5      Q.    Okay.

6              (Marked Riley Exhibit No. 6.)

7      Q.    (BY MS. WILLIAMS)   Let me just show you --

8  maybe this'll be easier.   Show you what's marked as

9  Exhibit 6, and this is Riley 19 through 21 are the

10 Bates numbers for Exhibit 6.   You've had a chance to

11 review?

12     A.    Yes.

13     Q.    And the subject of this e-mail string is "2016

14 vacation requests."   The first one starts

15 February 19th, 2016, from you to Melissa where you're

16 requesting a series of days off as vacation or leave,

17 including March 16th and 17th, May 9th, 10th, and 11th,

18 July 5th through August 1st for your surgery,

19 November 21st, and 22nd, December 28, 29th, and 30th

20 correct?

21     A.    Correct.

22     Q.    Okay.   And then Melissa's response indicates

23 that the March days were approved and she wanted

24 information about coverage, correct?

25     A.    Correct.

Malika Riley
January 24, 2019                                              211

1     Q.   And then she was asking you to explain given

2   the fact that you switched to a 9/80 schedule how that

3   might have impacted the remaining dates, correct?

4     A.   Correct.   I was previously on a 9/80 schedule.

5     Q.   Uh-huh.

6     A.   But I changed --

7     Q.   From --

8     A.   -- the Fridays that I would be off.

9     Q.   Okay.   And you responded and you gave her

10  information about coverage and the remaining days,

11  correct?

12    A.   Correct.

13    Q.   She did -- then responded and said they were

14  approved in -- on March 16; is that right?

15    A.   Correct.

16    Q.   And then it look like in May you were reminding

17  her that you were going to be out for the May dates and

18  her response was, "Thanks for the reminder.   Enjoy your

19  trip and time away.   Safe travels," right?

20    A.   Right.

21    Q.   Okay.

22              (Marked Riley Exhibit No. 7.)

23    Q.   (BY MS. WILLIAMS)   Let me show you what's

24  marked as Exhibit 7.   And Exhibit 7 is Bates-numbered

25  Riley 13.

Malika Riley
January 24, 2019                                    212

1    A.    Yes.

2    Q.    That e-mail is dated November -- the e-mail

3    string is November 15th and 16th.  Subject is "Doctor

4    appointment Friday and vacation request."  You're

5    notifying her about a doctor's appointment that you

6    have for that Friday and then a vacation request for

7    December 22nd.  She approved that as well, correct?

8    A.    Correct.

9    Q.    She said, "I appreciate the update"?

10   A.    Correct.

11   Q.    Okay.

12              (Marked Riley Exhibit No. 8.)

13   Q.    (BY MS. WILLIAMS)  Okay.  Going to show you

14   what's marked as Exhibit 8 to your deposition.

15   A.    Uh-huh.  Yes.

16   Q.    Okay.  And this e-mail is dated November 21st.

17   It's a string between you and Melissa.  Subject is "In

18   early to leave early for doctor's appointment."  Again,

19   you're notifying her about a doctor's appointment that

20   you had and that you would be -- need to leave the

21   office early at 1:30 that day, correct?

22   A.    Correct.

23   Q.    She responded and said, "Thanks.  I appreciate

24   the update.  I hope everything goes well today"?

25   A.    Yes.

Malika Riley
January 24, 2019                                           220

```
 1        Q.    Okay.  Why do you think Melissa was alienating
 2   you?
 3        A.    I don't know, other than the fact that I had
 4   communicated to Melissa that I was going to have a need
 5   to go out on leave in December.  I -- I can't speak to
 6   why she was acting towards me the way that she did, but
 7   I did disclose that information and --
 8        Q.    Did she start treating you differently than she
 9   had treated you before when you told her you were going
10   out on leave in December?  Because my understanding is
11   that your relationship with Melissa was always fairly
12   difficult, right, that you felt like it was hard to --
13   to please her, right?
14        A.    Yes.
15        Q.    At some point did that change, or was it pretty
16   consistent throughout the -- the entire time that you
17   were working for her that she treated you that way?
18        A.    I believe -- I felt as though it got
19   progressively worse.
20        Q.    Okay.
21        A.    And when I returned from leave, it worsened to
22   the point that I just did not feel like she was going
23   to let me successfully complete the performance
24   improvement plan.
25        Q.    Okay.  And she didn't -- did she ever say
```

Malika Riley
January 24, 2019                                          223

1      Q.    How was she picking on you regarding your work

2    product when she was also giving you positive feedback

3    about your work product in your PIP meetings?

4      A.    It was very confusing to me as well.  You tell

5    me that -- when I ask that I'm doing a good job, but at

6    the same time everything I give you, you're marking it

7    up, you're changing it, and you're telling me that I

8    need to do this different and when I do that, you tell

9    me I need to do something else different.  It

10   definitely sent conflicting messages to me.

11     Q.    Okay.  And so just so that I'm clear, between

12   October and November, she was giving you confusing

13   messages because on the one hand she would tell you you

14   were doing a good job but also during that time frame

15   she was mark -- marking up your work product telling

16   you to do things differently, expressing that she had

17   issues with your work product?

18     A.    She was expressing that -- yes.  In a -- in a

19   sense she was expressing that -- that she had concern,

20   but I deemed it -- some of the stuff was very nitpicky

21   and it just seemed like I was the target no matter what

22   it was.

23     Q.    And this is in the October/November time frame?

24     A.    Yes.

25     Q.    Okay.  So things felt positive, but it also --

1    she was also expressing that she had concerns that you

2    thought were kind of nitpicky concerns; is that right?

3        A.    Correct.

4        Q.    What concerns did she express to you in this

5    time frame that you thought were nitpicky?

6        A.    I think having me -- I have conducted several

7    other investigations through the course of my time

8    there and even under her direction, and at no point did

9    she ever express concerns with the investigations that

10   I conducted.

11              However, after I returned from leave, she

12   assigned me to certain investigations, a couple of

13   investigations, that no matter how many times I

14   presented information to her, she scrutinized it and

15   changed it and expected me to make the changes that she

16   recommended.  And then when I made those changes, she

17   would come back to me and say, "That's not what I

18   wanted.  I want it done this way."  And I was

19   constantly having to go back and forth.  I just --

20       Q.    Okay.  So that -- that's an area then between

21   October and November where Melissa was expressing that

22   she still had some issues with your performance.  I

23   understand that you don't agree with -- with what she

24   was saying, but she did share that with you in the

25   October/November time frame, correct?

Malika Riley
January 24, 2019                                    225

```
 1              MS. SPROVACH:  Objection, vague.
 2   Objection, asked and answered.
 3       A.    She did communicate that -- she did communicate
 4   that I wasn't delivering on the investigations as she
 5   would have liked to see it.  But I was making those
 6   corrections per her recommendation.
 7              And I just felt as though she was not --
 8   I -- I felt as though she was treating me differently
 9   than my peers.  And I -- I didn't understand why.  And
10   that specifically was not mentioned in my performance
11   improvement plan or anything that I needed to deliver
12   on related to the performance improvement plan.
13       Q.    (BY MS. WILLIAMS)  So you knew before your
14   termination that Melissa had issues with the way that
15   you were delivering on one or more of the
16   investigations that you were handling at the time,
17   correct?
18              MS. SPROVACH:  Objection, form and
19   objection, vague.
20       A.    I -- I mean, I can't speculate.  I mean, she
21   didn't tell me that -- specifically that it was an
22   issue.  However, she would mark up the work product and
23   just expect that I would make the corrections and then
24   she would change what she was asking me to do.
25       Q.    (BY MS. WILLIAMS)  Okay.
```

1     A.    So I was just confused by her expectations at

2  that point.

3     Q.    And you said she communicated that you were not

4  delivering on the investigation.  She communicated that

5  to you in some form before your termination, correct?

6     A.    Yes.

7     Q.    Okay.  Do you know which investigation that was

8  regarding?  Was that the lab investigation?

9     A.    I believe it was.

10     Q.    Do you recall there being an issue with the lab

11  investigation where the employee who actually made the

12  complaint had not been interviewed in a timely fashion

13  and, in fact, numerous other witnesses had been

14  interviewed before the complaining party had actually

15  been interviewed?  Do you recall that being an issue?

16     A.    No.

17          MS. SPROVACH:  Objection, no foundation,

18  calls for speculation, assuming facts not in evidence.

19     Q.    (BY MS. WILLIAMS)  Was that an issue?

20     A.    It was not communicated to me that that was an

21  issue.

22     Q.    Was it the case that the complaining party was

23  not interviewed until multiple other witnesses had been

24  interviewed regarding the investigation?

25     A.    Can you tell me who the complaining party was

Malika Riley
January 24, 2019                                              228

1    where she expressed any concern that she had that you

2    thought was nit -- nitpicky?

3        A.   No.  I don't -- I don't recall any other

4    concerns.

5        Q.   There were no other concerns at all or just no

6    other that you thought were nitpicky?

7        A.   I don't -- I don't recall any other concerns.

8        Q.   Okay.  After you were terminated, did you reach

9    out to anyone at the company to make a complaint about

10   your termination?

11       A.   After my termination --

12       Q.   Yes.

13       A.   -- did I reach out?  I did.

14       Q.   Do you recall to whom you reached out to

15   complain about your termination?

16       A.   I reached out to EthicsPoint, and I reached out

17   to the CEO at that time.

18       Q.   Who's the CEO at the time?  Pete Cella, does

19   that sound familiar?

20       A.   Yes.

21       Q.   Okay.  When you submitted the EthicsPoint

22   complaint and then your -- you reached out to Pete

23   Cella in writing, correct?

24       A.   Yes.

25       Q.   Okay.  Was that by e-mail or some other form?

Malika Riley
January 24, 2019                                                    229

1      A.    It was some other form.

2      Q.    What was that?

3      A.    LinkedIn.

4      Q.    Okay.  When you -- and your EthicsPoint

5    complaint, was that in writing, online, or was that a

6    phone message where you submitted the complaint?  What

7    form was the EthicsPoint complaint?

8      A.    That was a phone message.

9      Q.    Okay.  In your EthicsPoint complaint and then

10   in your communication to Pete Cella, did you identify

11   for the company the fact that you thought Melissa had

12   treated you unfairly, and is that what you were

13   complaining about essentially?

14     A.    There were a number of things that I complained

15   about.

16     Q.    Do you recall what some of those were?

17     A.    The fact that I had been terminated and I was

18   still on a family medical leave intermittently.  I

19   believe I mentioned the performance improvement plan.

20   I believe that I mentioned the fact that I was treated

21   differently from my peers.  And I -- I don't recall

22   anything else.

23     Q.    Do you recall offering a reason that you

24   thought you were treated differently from your peers?

25     A.    In the EthicsPoint, or are you referring to in

1   my communication to Pete Cella?

2       Q.   In both.  But we can take them one at a time.

3   In your EthicsPoint did you -- did you indicate that

4   you thought you were treated differently from your

5   peers?

6       A.   I don't -- I don't believe I did.

7       Q.   In your communication with Pete Cella, did you

8   indicate that you thought you were treated differently

9   than your peers?

10      A.   I did indicate that I thought I was treated

11  differently than my peers.  I don't recall if I stated

12  a specific reason as to why.

13      Q.   What was the reason at the time that you

14  thought you were treated differently than your peers,

15  if you had one?

16      A.   Just based on the -- Melissa's response to me,

17  leaving me out of meetings, not speaking to me when she

18  would go around and make her rounds.  There were

19  various reasons that I thought that -- or I felt that I

20  was being treated differently than my peers.

21      Q.   Do you recall indicating to Pete Cella and then

22  in connection with the EthicsPoint complaint that you

23  thought Melissa was treating you differently because of

24  your race?

25      A.   I felt that I was discriminated against.

Malika Riley
January 24, 2019                                    231

1      Q.    Because of your race?

2      A.    I felt that that could have had something to do

3  with it.

4      Q.    What else could have had something to do with

5  it?

6      A.    The fact that I had raised concerns that I

7  would need to go back out on medical leave of absence,

8  and I had been aware that there were other former

9  employees that had gone out on leave and were

10 terminated from the company upon return or soon after

11 they returned.

12     Q.    These were employees that Melissa supervised?

13     A.    No.

14     Q.    Okay.   Other employees in other departments of

15 the company?

16     A.    Correct.

17     Q.    Okay.   Okay.   So your recollection is that you

18 indicated that you thought you were being treated

19 differently because of your race, right?

20     A.    I thought I was being treated differently

21 because of that.   I was being discriminated against and

22 because I raised concerns about needing to be out again

23 on leave for a family medical leave.

24     Q.    Okay.   When you communicated with Pete Cella

25 and then when you left the EthicsPoint complaint, did

Malika Riley
January 24, 2019                                    238

1    Q.   And you have an FMLA retaliation claim.   Is

2   that your understanding?

3    A.   Correct.

4    Q.   So can you please share with us what you're

5   claiming the company did wrong with respect to your

6   FMLA interference claim?

7              MS. SPROVACH:   Objection to the extent

8   the answer requires a legal conclusion.   Those two

9   answers to those two claims are what we've been doing

10   for the last seven hours.

11    Q.   (BY MS. WILLIAMS)  Right.  How did the company

12   interfere with your FMLA rights, from your perspective?

13              MS. SPROVACH:   Objection to the extent

14   the answer requires a legal conclusion.   Objection to

15   the extent it's been asked and answered.

16    Q.   (BY MS. WILLIAMS)  You can answer.

17    A.   I feel like there was a violation of my FMLA

18   rights.

19    Q.   In what respect?

20    A.   In that I was terminated, and the basis was

21   that I asked for -- or I made it known that I was going

22   to have to go back out on FMLA.   And I felt that that

23   was the reason for my termination.

24    Q.   So your complaint with respect to the FMLA

25   violation is that you were terminated after you made it

Malika Riley
January 24, 2019                                          239

1    known that you were going back out on FMLA leave?

2                MS. SPROVACH:  Objection to the extent

3    the answer requires a legal conclusion.  Objection to

4    the extent the question is asked and answered.

5        A.   I'm sorry.  I'm at a loss for -- can you repeat

6    the question?

7        Q.   (BY MS. WILLIAMS)  You think that you were

8    terminated -- is it your contention in this lawsuit

9    that the company terminated you because you made it

10   known that you were going to be back out on FMLA leave

11   in December of 2016?

12               MS. SPROVACH:  Objection to the extent

13   the answer requires a legal conclusion.

14       A.   I feel as though that was the reason -- primary

15   reason for my termination.

16       Q.   (BY MS. WILLIAMS)  That you had requested to go

17   back out on leave in December of 2016?

18               MS. SPROVACH:  Objection, asked and

19   answered.  Objection, calls for a legal conclusion.

20       A.   I -- I just -- I feel that there was a

21   violation of my FMLA rights.

22       Q.   (BY MS. WILLIAMS)  Okay.  And you -- you said

23   that you think the primary reason was because you were

24   going to go back out on FMLA leave in December.  You --

25   you called -- you described that as the primary reason;

Malika Riley
January 24, 2019                                                240

1   is that right?

2                MS. SPROVACH:  Objection, the testimony

3   will speak for itself.  Objection, it calls for a legal

4   conclusion.  Objection, speculation.

5        A.    I -- I feel like there was a violation of my

6   FMLA rights.

7        Q.    (BY MS. WILLIAMS)  I get that and -- but what I

8   want to understand is you said that the re- -- the fact

9   that you were going to go back out on leave was a

10  primary reason.  Are there other reasons that you think

11  that the company violated your FMLA rights?

12               MS. SPROVACH:  Objection, calls for a

13  legal conclusion.  Objection, asked and answered.  Go

14  ahead.

15       A.    I -- I don't want to speculate as to why --

16  what Melissa's intentions were with my termination.  I

17  feel that it was unfair.  I -- I feel that it -- it was

18  a violation of my protected right.

19       Q.    (BY MS. WILLIAMS)  Okay.  And what -- the

20  violation was the fact that you were terminated?

21       A.    The vi- --

22               MS. SPROVACH:  Objection, calls for a

23  legal conclusion.  Objection, asked and answered.

24  Pretty soon I'm going to instruct her not to answer it.

25               MS. WILLIAMS:  I'm just trying to --

Malika Riley
January 24, 2019                                          241

1          MS. SPROVACH:  She's answering them.

2      Q.   (BY MS. WILLIAMS)  Right.  And what I want to

3   understand is this:  You're complaining about the fact

4   that you were terminated, correct?

5      A.    I'm -- my complaint is the fact that I was

6   terminated and I was on a protected leave.

7      Q.   Okay.  So you were terminated on a protected

8   leave, and you think that's a violation of your FMLA

9   rights.  I'm not asking you to -- to make any

10  conclusions about the law.  In terms of the facts,

11  that's your complaint in this lawsuit or at least one

12  of them; is that right?

13         MS. SPROVACH:  The question inherently

14  asks for a legal conclusion, so therefore I'm going to

15  object.  The question has been asked and answered.

16     A.   I -- I -- I feel that there was a violation of

17  my FMLA rights.

18     Q.   (BY MS. WILLIAMS)  By terminating you?

19         MS. SPROVACH:  Objection, asked and

20  answered.  Objection, calls for legal speculation.

21         THE WITNESS:  I mean, do I have to

22  answer?

23         MS. SPROVACH:  You can answer to the best

24  of your abilities even though you've answered it --

25  answered it several times.

Malika Riley
January 24, 2019                                    242

1      A.    Okay.   I -- I just feel like there was a

2   violation of my FMLA rights, and I don't feel that it

3   was just and fair, my termination.

4      Q.    (BY MS. WILLIAMS)  Okay.   Other than your

5   termination, do you think the company did anything else

6   that violated your FMLA rights that you're complaining

7   about in this lawsuit?

8                MS. SPROVACH:   Objection, calls for a

9   legal conclusion.

10      A.    I -- again, I feel that my FMLA rights were

11   violated and I was wrongfully termi- -- terminated.

12      Q.    (BY MS. WILLIAMS)  Other than being wrongfully

13   terminated, did -- did your FMLA -- FMLA rights get

14   violated in any other way as far as your complaints in

15   this lawsuit are concerned?

16                MS. SPROVACH:   Objection, calls for a

17   legal conclusion.   Objection, asked and answered.

18      A.    I'm not sure how else you want me to answer the

19   question.

20      Q.    (BY MS. WILLIAMS)  I don't have -- honestly, I

21   don't have a specific way I want you to answer it.   I'm

22   just trying to understand -- in preparation for the

23   defense in this case I just want to understand

24   everything that you're saying the company did wrong.

25   The termination obviously is one thing, right?

Malika Riley
January 24, 2019                                               243

1    A.    Right.

2    Q.    Is there anything else that you think that the

3    company did wrong that you're complaining about under

4    the FMLA?

5              MS. SPROVACH:   Objection, asked and

6    answered.   Objection, calls for legal conclusion.

7    A.    I -- I felt to some extent I -- I was

8    discriminated against and that my FMLA rights were

9    violated.

10   Q.    (BY MS. WILLIAMS)   Discriminated against for

11   what?

12   A.    On the basis that I needed to take another

13   leave of absence for FMLA.

14   Q.    Okay.

15   A.    And I feel as though I was treated differently

16   from my peers during the course of my employment under

17   Melissa Simpson's direction.

18   Q.    Okay.   Anything else that you're going to

19   contend that the company did wrong with respect to your

20   FMLA claims?

21             MS. SPROVACH:   Objection, calls for legal

22   conclusion.

23   A.    There -- there -- there may be other things.

24   As of right now, I can't recall anything specifically.

25   Q.    (BY MS. WILLIAMS)   And I know your lawyer is

 1   of the right pages there for you.  Yeah.

 2              MS. SPROVACH:  Thank you.

 3        Q.   (BY MS. WILLIAMS)  Okay.  I'm showing you

 4   what's been marked as Exhibit 9 to your deposition.

 5   After you've had a chance to look at that, let me know.

 6        A.   Okay.  Okay.

 7        Q.   Do you recognize the document that's been

 8   marked as Exhibit 9?

 9        A.   Yes.

10        Q.   What is that document?

11        A.   This is the educational fund application for

12   tuition reimbursement.

13        Q.   Okay.  And that reflects -- your signature is

14   reflected in the middle of the document or a little bit

15   above the middle of the document dating -- dated

16   2/23/15; is that right?

17        A.   Correct.

18        Q.   Did you read the terms of this document and

19   this application before you signed it?

20        A.   I did read the information presented here that

21   I signed off on, and I -- I don't recall if I read the

22   -- the document in its entirety.

23        Q.   What doc- -- you mean the educational refund

24   policy that's attached?

25        A.   The -- yes.

Malika Riley
January 24, 2019

250

1    Q.   Have you repaid Chevron Phillips Chemical any

2    money that was paid on your behalf pursuant to this

3    educational refund application?

4    A.   No.

5    Q.   Is it your position that you do not owe them

6    any repayment on the educational refund?

7    A.   That is my position.  At the time when I

8    terminated, Melissa stated that if I signed the

9    severance, I would not be expected to pay back any

10   portion of the tuition reimbursement and I would be

11   paid out my vacation at that time.  I did not want to

12   sign the severance agreement without consulting with my

13   attorney, so I didn't sign at the time that she was

14   trying to get me to sign it.

15   Q.   Okay.  If you had signed the severance

16   agreement, one of the terms of that is that the company

17   would forgive the educational refund loan, correct?

18   A.   Correct.

19   Q.   That's what was presented to you?

20   A.   Correct.

21   Q.   You ultimately did not accept any of the terms

22   of the severance agreement, correct?

23   A.   Correct.

24   Q.   Including the offer to waive the educational

25   refund loan?

Malika Riley
January 24, 2019                                        251

```
 1      A.   I wanted to consult with my attorney first, and

 2   my understanding was that -- it was communicated to me

 3   that, voluntarily, if I terminate or for any other

 4   reason -- I didn't have any reason to believe that I

 5   would be expected to pay it back if I involuntarily

 6   terminated, if I was terminated from the company.

 7      Q.   Okay.  That was your understanding.  I'm just

 8   trying to confirm you ultimately never accepted the

 9   offer that the company made to waive the educational

10   loan that was presented as a part of the severance

11   agreement, right, because you never signed the

12   agreement, right?

13      A.   I never signed the agreement because I wanted

14   to consult with my attorney first.

15      Q.   Fair enough.  And therefore any discussions

16   that you had with -- with Melissa with respect to

17   possibly waiving the educational refund loan, that

18   essentially became moot because you never agreed to any

19   of those terms in the severance agreement?

20      A.   I didn't sign it at the time that she presented

21   it to me, correct.

22      Q.   Okay.  And you didn't otherwise agree to -- to

23   any of the terms, correct, at any point of the

24   severance?

25      A.   Correct.
```

Malika Riley
January 24, 2019                                        259

1    Q.    Okay.   Anything else you can think of?

2    A.    Not at -- no.

3    Q.    Okay.   When you returned from your FMLA leave,

4    you returned to your same position with your same

5    duties, correct?

6    A.    Correct.

7              MS. WILLIAMS:   Okay.   Okay.   I'll pass

8    the witness.

9              E X A M I N A T I O N

10   BY MS. SPROVACH:

11   Q.    Ms. Riley, I joke, but I do talk faster than

12   just about anybody.   So if you need me to repeat

13   myself, just let me know.

14   A.    Okay.

15   Q.    And I will try to slow down.   When you were

16   terminated, were you on FMLA?

17   A.    Yes.

18   Q.    When you were terminated, had you again

19   requested FMLA?

20   A.    Yes.

21   Q.    Were you able to take that second FMLA right

22   before you were fired?

23   A.    Yes.

24   Q.    The one before you were terminated?

25   A.    No.   I'm sorry.   I misunderstood.   No.   I was

Malika Riley
January 24, 2019                                              265

1     A.    Yes.

2     Q.    Was there a written policy that you know of in

3    terms of what order you must conduct an investigation?

4     A.    No.   I'm sorry.   Can you restate that question?

5     Q.    Sure.   When you were conducting an

6    investigation, was there a policy that required you to

7    question the complaining witness first?

8     A.    No.

9     Q.    When you requested your FMLA at the company,

10   who did you make the request to?

11    A.    UPMC.

12    Q.    And who's UPMC?

13    A.    The third party.

14    Q.    Okay.   And did the third party -- were you

15   required to keep the third party updated as to your

16   leave?

17    A.    Yes.   As well as my manager, Melissa Simpson.

18    Q.    Okay.   And did you do that?

19    A.    Yes.

20    Q.    Were you required to give your medical illness

21   specifics or your requests for any accommodations to

22   your supervisor or to a third party or to someone like

23   a company doctor?

24    A.    Was I required to give my medical restriction

25   specifics to anyone --

Malika Riley
January 24, 2019                                    273

1          A.    Correct.

2          Q.    Okay.  And -- and in that respect, notifying

3    and talking to Melissa was an appropriate thing to do,

4    right?

5          A.    Correct.

6          Q.    Okay.

7          A.    And that is what I did.

8          Q.    Right.  And then she responded to you on each

9    occasion?

10         A.    Yes.

11         Q.    Okay.  I think you -- you testified that you

12   think that you were terminated with two months left on

13   the PIP.  You were terminated on November 28th,

14   correct?

15         A.    Correct.

16         Q.    And I think we talked about this earlier.  The

17   PIP was extended through sometime in December, correct?

18         A.    Correct.  But during the time that I took the

19   leave I was told that it would be extended and the

20   additional time that I had not completed would be

21   allowed for me to complete the requirements of the PIP.

22         Q.    It was extended, though, when you returned from

23   leave, right?

24         A.    It was extended.

25         Q.    Okay.  And when you received the PIP document,

Malika Riley
January 24, 2019

293

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   MALIKA RILEY                    )
              Plaintiff,            )
 4                                   )
     V.                              )  Civil Action No.
 5                                   )  4:17-cv-01332
     CHEVRON PHILLIPS CHEMICAL       )
 6   CORPORATION, LP                 )
              Defendant.            )  JURY DEMANDED
 7

 8   ********************************************************

 9   THE STATE OF TEXAS:
     COUNTY  OF  HARRIS:
10

11              I, Kathleen Rossi Tyler, a Certified

12   Shorthand Reporter in and for the State of Texas,

13   hereby certify to the following:

14              That the witness, MALIKA RILEY, was duly

15   sworn by the officer and that the transcript of the

16   oral deposition is a true record of the testimony given

17   by the witness;

18              That examination and signature of the

19   witness to the deposition transcript was waived by this

20   witness and agreement of the parties at the time of the

21   deposition;

22              That the original deposition was

23   delivered to MS. MARLENE C. WILLIAMS;

24              That the amount of time used by each

25   party at the deposition is as follows:
```

U.S. LEGAL SUPPORT, INC
713-653-7100

Malika Riley
January 24, 2019

294

1          MS. ELLEN SPROVACH - 0:16

2          MS. MARLENE C. WILLIAMS - 6:28

3               I further certify that I am neither

4   counsel for, related to, nor employed by any of the

5   parties or attorneys in the action in which this

6   proceeding was taken, and further that I am not

7   financially or otherwise interested in the outcome of

8   the action.

9               GIVEN UNDER MY HAND AND SEAL OF OFFICE,

10  on this, the 31st day of January, 2019.

11

12                    *Kathleen Rossi Tyler*

13                    _____

14                    KATHLEEN ROSSI TYLER
                      TEXAS CSR NO. 8874
                      Expiration Date:  12-31-19

15

16  U.S. LEGAL SUPPORT, INC.
    Firm Registration No. 122
    16825 Northchase Drive, Suite 800

17  Houston, Texas  77060
    (713) 653-7100

18

19                    JOB NO. 1-286079

20

21

22

23

24

25